**NEW YORK STOCK EXCHANGE, INC., and Investment Company Institute, Plaintiffs,**

v.

**James E. SMITH, Comptroller of the Currency, the Department of the Treasury, Defendant.**

Civ. A. No. 74–1405.

United States District Court, District of Columbia.

Dec. 5, 1975.

John E. Nolan, Jr., Michael D. Sandler, Washington, D. C., for New York Stock Exchange.

Richard A. Goldstein, G. Duane Vieth, Arnold & Porter, Washington, D. C., for Investment Co. Institute.

David C. Shonka and Nicholas Diacou, Attys., Dept. of Justice, Gen. Litigation Section, Civ. Div., Washington, D. C., for defendant.

## MEMORANDUM OPINION

FLANNERY, District Judge.

Plaintiffs seek a judgment declaring invalid a ruling of the Comptroller of the Currency holding that automatic stock purchasing services offered by national banks did not violate sections 16 and 21 of the Glass-Steagall Act, 12 U.S.C. §§ 24, 378 (1970). The matter is now before the court on cross motions for summary judgment, pursuant to rule 56 of the Federal Rules of Civil Procedure. Defendant also urges that the case be dismissed on the grounds that plaintiffs lack standing to sue, the ruling in question is not reviewable, and necessary parties have not been joined. The court finds that plaintiffs have satisfied all threshold requirements, but that defendant is entitled to summary judgment on the merits.

I

This action is brought by the New York Stock Exchange (NYSE), a national securities exchange, and the Investment Company Institute (ICI), an association of open-end investment companies and their investment advisors and principal underwriters. Defendant James E. Smith, the Comptroller of the Currency, is responsible for the supervision and regulation of the national banking system. On June 10, 1974, he issued an opinion letter stating that sections 16 and 21 of the Glass-Steagall Act do not prohibit national banks from offering customers automatic stock purchasing services.

The plan approved in the Comptroller's letter, called Automatic Investment Service (AIS), permits checking account customers to designate a sum of money between $20 and $500 to be deducted automatically from their account each month and invested in one of 25 selected securities. The 25 stocks available are those having the highest aggregate market value of outstanding stock on Standard & Poor's 425 Industrial Index. Advertising brochures and the contracts between AIS customers and their banks state that the banks make no recommendation as to the merits of any individual stock or to the group of stocks as a whole. The plans are extensively advertised, however, and the stocks are often referred to as "blue chip."

When an AIS customer orders a stock, the bank has 30 days in which to complete the transaction. The bank does not promise to obtain the best possible price during the 30 days, only to execute the order before the end of that period. Until it purchases the securities ordered, the bank holds the customer's money in a common AIS account, interest free. The actual price charged against the customer's account is the average price paid by the bank for all shares of the same stock bought during the 30 days, plus a pro rata share of the brokers' commissions and a service charge.[1] When the amount designated for investment will not purchase an additional whole share at the average price, the customer is credited with a fractional share. Because all purchases of a single security are aggregated, no single purchase can be identified as being made for any particular customer.

Stocks purchased under AIS are held in the name of the purchasing bank, but the customer has full beneficial ownership. The customer can vote the shares and will directly receive any dividends paid on them. A customer can withdraw from the plan at any time and receive his stock certificates or their cash value. If a customer wishes to sell only a portion of his holdings, the bank will also execute the transaction for him. When holdings acquired under AIS are liquidated, the bank will often "cross" the sell order with a buy order from another AIS customer. Internal crosses allow the bank to avoid paying a broker's fee on the transactions and ensure that the money will not be needed for the full 30 days.

The letter of June 10, 1974, numbered 27 pages in length and represented the culmination of a substantial deliberative effort by the Comptroller. Consideration of AIS began on October 30, 1972, when the Security Pacific National Bank requested the Comptroller's opinion of the plan's legality. Following the issuance of a letter approving AIS, both ICI and NYSE requested the Comptroller to reconsider his position. Briefs exploring the legal merits of AIS were submitted by NYSE, ICI, and several national banks. After reviewing these documents, which contained virtually all the arguments presented by the parties now before the court, the Comptroller issued the June 10 letter.

II

Defendant urges upon the court several preliminary arguments which, if correct, would prevent adjudication of the merits of plaintiffs' complaint. Specifically, defendant contends that plaintiffs lack standing, that the letter in issue is not a reviewable agency action and, consequently, no justiciable case or controversy exists, and that plaintiffs have failed to join indispensable parties. The court finds no merit in any of these contentions.

■ Defendant's first argument is that plaintiffs lack standing to bring this suit.[2] That the plaintiffs have standing to sue was conclusively established by the Supreme Court in *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and *Investment Company Institute v. Camp*, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971). In *Data Processing*, the Court held that competitors of businesses aided by agency action suffered sufficient injury to effectively

---

1. A major attraction of the plan for small investors is that the total cost of a transaction, including the bank's fee, is lower than that the customer would incur if he went to a broker since the bank can take advantage of the lower commission rates charged on large orders.

2. Defendant, while contending that neither plaintiff has standing, has moved to dismiss only against NYSE. The reason stated by defendant for this distinction is that he can prove lack of injury to ICI's members only after discovery. ICI alleges competitive injury to its members in the complaint, however, and the court finds the two plaintiffs impossible to separate.

challenge that action. The Court also found that Congress, when passing the Glass-Steagall Act, arguably intended to protect nonregulated parties from competition by national banks. In *Investment Company Institute,* which concerned the operation of investment funds by national banks, the Court held that one of the very plaintiffs in the instant case was arguably within the zone of protection carved out by the Glass-Steagall Act. The potential competitive injury to NYSE and ICI in the case at bar is indistinguishable from that suffered by ICI in *Investment Company Institute.* Defendant's argument that NYSE and ICI actually benefit from the operation of AIS because it attracts new investors to the market lacks substance. If plaintiffs did not feel substantially threatened by AIS, they would not have undertaken this burdensome litigation.

A more substantial issue raised by defendant is the power of the court to review the opinion letter in question. Defendant submits that the opinion letter is not subject to review under section 10 of the Administrative Procedure Act, 5 U.S.C. § 704 (1970), because it is not legally binding on any party or the Comptroller's Office and because the plaintiffs conduct is not directly affected by the Comptroller's interpretation of the statute.[3]

The propriety of reviewing a statutory interpretation by an agency responsible for administering the act has been explored at length by the Supreme Court in *Abbott Laboratories, Inc. v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and by the Court of Appeals for the District of Columbia Circuit in *National Automatic Laundry and Cleaning Council v. Shultz,* 143 U.S. App.D.C. 274, 443 F.2d 689 (1971) and *Continental Air Lines, Inc. v. CAB,* 522 F.2d 107 (D.C.Cir. 1975) (en banc).

*Abbott Laboratories* established that in deciding whether an agency ruling is ripe for judicial review a court must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." 387 U.S. at 148–49, 87 S.Ct. at 1515. Further, doubt as to justiciability must be resolved in favor of the plaintiff since the Administrative Procedure Act "embodies the basic presumption of judicial review  . . ." *Id.* at 140, 87 S.Ct. at 1511.

■■■ The fitness of a particular ruling for judicial review depends upon its finality and the court's ability to discern and resolve the legal issues the ruling presents. *See Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 162–63, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); *National Automatic Laundry and Cleaning Council v. Shultz, supra,* at 694. An opinion letter signed by the head of an agency, not indicating on its face that it is tentative, and growing out of substantial deliberation is "presumptively final" for purposes of judicial review. *National Automatic Laundry and Cleaning Council v. Shultz, supra,* at 701–02. This is so even though the opinion legally could be reconsidered by the agency at any time. Thus, in *Continental Air Lines* the court of appeals reviewed the merits of a CAB order which was not legally binding on the agency. *See* 522 F.2d at 123, 124–25. The agency action reviewed in *NALCC* similarly did not bind the agency, and, in fact, was an opinion letter interpreting a portion of the statute administered by the agency. *See* 443 F.2d at 692, 702. Opinion letters signed by an agency head are also "presumptively final" even though they have no legal effect on parties subject to agency regulation; the opinion need only affect those subject to regulation and their competitors as a practical matter. *See Continental Air Lines, Inc.*

---

3. *Investment Company Institute v. Camp* involved an attack upon a regulation promulgated by the Comptroller rather than upon an opinion letter by the Comptroller and, thus, does not control the issue of justiciability in the case at bar. *See* 401 U.S. at 619–20, 91 S.Ct. 1091.

*v. CAB, supra,* at 124–25, *citing, Bantam Books, Inc v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). In the instant case, the opinion letter is signed by the agency head, shows no indication of being tentative, follows substantial deliberation, and, as a practical matter, encourages national banks to institute AIS programs. It thus appears that the letter is sufficiently final to permit judicial review of its merits.

■ The letter in issue is also fit for judicial review in all other respects since the court can discern and resolve the legal issues involved. The principal factor considered in judging this aspect of an action's fitness for review is whether the case turns on a "purely legal" question. *See Abbott Laboratories, Inc. v. Gardner, supra,* 387 U.S. at 149, 87 S.Ct. 1507; *Continental Air Lines, Inc. v. CAB, supra,* at 126; *National Automatic Laundry and Cleaning Council v. Shultz, supra,* at 695. There is no doubt that the case at bar presents a "purely legal" question only, the validity of the Comptroller's construction of the Glass-Steagall Act. Further, it is a legal question properly before this court since the Supreme Court has stated that Congress did not intend to preclude judicial review of actions taken by the Comptroller in furtherance of his obligations under the Act. *See Investment Company Institute v. Camp, supra,* 401 U.S. at 620, 91 S.Ct. 1091; *Association of Data Processing Service Organizations, Inc. v. Camp, supra,* 397 U.S. at 157, 90 S.Ct. 827.

Considering the second prong of the test set out in *Abbott Laboratories,* the court finds that the plaintiffs will suffer substantial hardship if the court withholds consideration of the Comptroller's letter at this time. National banks are presently offering AIS to customers as a direct result of the Comptroller's ruling, thereby injuring the plaintiffs who, heretofore, were free of bank competition in the securities field. Defendant argues that plaintiffs are not directly subject to regulation by the Comp-

troller and thus are not facing the dilemma of obeying a questionable ruling or accepting the consequences of violating it. This, of course, was precisely the position of the plaintiffs in *Continental Air Lines* and *NALCC* and it was because the plaintiffs faced such a dilemma that the courts in those cases determined that withholding review would cause hardship. *See* 522 F.2d at 126; 443 F.2d at 696. The plaintiffs in *Continental Air Lines* and *NALCC* faced a "Hobson's choice" for a simple reason, they were adversely affected by the agency action. The position of plaintiffs in the case at bar is the other side of this coin. The agency action benefited those directly regulated by the statute; only non-regulated parties, like the plaintiffs, are hurt by the Comptroller's letter and, consequently, only non-regulated parties would seek to challenge the letter. Prohibiting review in this case because plaintiffs are not faced with the prospect of having to disobey a regulation would undermine the Supreme Court's holding in *Data Processing* that competitors of parties directly affected by agency action have standing to challenge such action. Indeed, the need for review is even stronger in the instant case than it was in *Continental Air Lines* or *NALCC* since the agency actions attacked in *Continental* and *NALCC* would come under judicial scrutiny when a party chose to disobey the agency, but the action attacked by plaintiffs here will never come under review if this case is dismissed.

Having examined the Comptroller's letter here under attack in light of the principles set forth in *Abbott Laboratories, NALCC,* and *Continental Air Lines,* the court is convinced that judicial review is appropriate. The factors justifying review in the instant case are well summarized by the following passage from *NALCC:*

When a general, interpretative ruling signed by the head of an agency has been crystalized following reflective examination in the course of the agen-

cy's interpretative process, and is accordingly entitled to deference not only as a matter of fact from staff and citizenry expected to conform but also as a matter of law from a court reviewing the question, there coexist both multiple signposts of authoritative determination, finality and ripeness, and a concomitant indication that the resultant pointing toward prompt judicial review will benefit the total administrative process by resolving uncertainties without intolerable burden or disruption.

443 F.2d at 702.

■ Defendant's third preliminary argument, that indispensable parties have not been joined, is really no more than a reformulation of the reviewability argument. Defendant reasons that since the letter in question is merely advisory, the court can grant meaningful relief only if the banks now offering AIS are before it. The court can, however, order the Comptroller to revoke or modify his interpretation of the statute and such relief would have a significant practical, if not legal, impact on the use of AIS. In *Commercial State Bank of Roseville v. Gidney*, 174 F.Supp. 770 (D.D.C.1959), *aff'd* 108 U.S.App.D. C. 37, 278 F.2d 871 (1960), the court expressly held that a party challenging an action of the Comptroller taken pursuant to the Glass-Steagall Act need not join the national bank directly affected by the ruling under attack. Since the court can review the Comptroller's decision in the case at bar, no other party's presence is required.

### III

■ The principal substantive issue presented by this litigation is whether the Comptroller properly construed the Glass-Steagall Act as permitting national banks to purchase securities for their customers on a continuous and widespread basis. Section 16 of the Act provides, in relevant part,

> The business of dealing in securities and stock by [a national bank] shall be limited to purchasing and selling such securities and stock without recourse, solely upon the order, and for the account of, customers, and in no case for its own account, and [a national bank] shall not underwrite any issue of securities or stock . . .

12 U.S.C. § 24 (1970). Section 21 of the Act provides that conduct exceeding the limits set out in section 16 shall be illegal.[4]

At the outset, the court notes that it gives "great weight" to the Comptroller's ruling. *Investment Company Institute v. Camp*, 401 U.S. 617, 626–27, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971). The Supreme Court has consistently held that reasonable constructions of regulatory statutes by the agencies charged with enforcement of those statutes are to be respected by reviewing courts. *See, e. g., Investment Company Institute v. Camp, supra; Zemel v. Rusk*, 381 U.S. 1, 11, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). Unlike *Investment Company Institute*, where the Comptroller promulgated a controversial regulation without opinion or accompanying state-

---

4. Section 21 provides:
   (a) After the expiration of one year after June 16, 1933, it shall be unlawful—
   (1) For any person, firm, corporation, association, business trust, or other similar organization, engaged in the business of issuing, underwriting, selling, or distributing, at wholesale or retail, or through syndicate participation, stocks, bonds, debentures, notes, or other securities, to engage at the same time to any extent whatever in the business of receiving deposits subject to check or to repayment upon presentation of a passbook, certificate of deposit, or other evidence of debt, or upon request of the depositor: Provided, That the provisions of this paragraph shall not prohibit national banks . . . from dealing in, underwriting, purchasing, and selling investment securities, or issuing securities to the extent permitted . . . [by] section 24 of this title . . . .
   12 U.S.C. § 378(a) (1970).

ment, this court has the benefit of a comprehensive and well-reasoned explanation of his ruling by the Comptroller. The various briefs submitted by the Comptroller at his request presented most of the arguments and legal theories advanced by the plaintiffs before this court, and the Comptroller's rejection of these arguments will be respected, even if the court would have reached a different result were this a question of first impression. *See Udall v. Tallman, supra.*

An analysis of the legal issues involved in the Comptroller's construction of the Glass-Steagall Act indicates that his final opinion was eminently reasonable. Certainly the language of section 16, when read literally, supports the Comptroller's construction of the Act. Section 16 permits national banks to purchase and sell securities if (1) the bank acts as agent for a customer, (2) the transactions are without recourse, (3) the transactions are initiated solely upon the order of the customer, and (4) the transactions are for the account of the customer and not for the bank's account. AIS conforms to this language since (1) participants must be checking account customers of the bank, (2) the bank makes no warranty as to the quality of the investment, (3) no sales or purchases are executed unless directed by the customer, and (4) the customer has full beneficial ownership of the securities.

Although AIS appears to meet the letter of the Glass-Steagall Act, plaintiffs argue forcefully that it fails to meet the Act's spirit. Plaintiffs contend that in carving out this narrow exception to the general ban on participation in securities-related activities by national banks, Congress never intended to authorize a large-scale, computerized service. Further, plaintiffs note that certain bank brochures advertising AIS inform prospective participants that checking accounts are free, thus rendering compliance with the statutory requirement of a customer relationship

highly technical. In short, plaintiffs assert that Congress granted the banks narrow authority to continue a service provided to established customers as a courtesy, but that AIS far exceeds this authority insofar as it is used to attract customers to banks in the first place.

Plaintiffs' interpretation of the Act is supported by early opinions of the Comptroller, which construed section 16 as allowing banks to purchase and sell stocks for customers' accounts only where the service was an "accommodation", the customer relationship existed independently of the service, the bank did not engage in the brokerage business, and the bank made no profit on the transactions. *See 1 Bulletin of the Comptroller of the Currency,* No. 2, Oct. 26, 1935, at 2–3 (summary of previous interpretations). While administrative interpretations of a statute made contemporaneously with its enactment are often relied upon by courts in resolving ambiguity as to legislative intent, *NLRB v. Bell Aerospace,* 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *National Lead Company v. United States,* 252 U.S. 140, 40 S.Ct. 237, 64 L.Ed. 496 (1920), such interpretations are always subject to revision. In fact, a 1957 interpretation issued by the Comptroller removed the prohibition against making a profit on securities bought and sold for customers. *See* Digest of Opinions, ¶ 220A (1957). The Comptroller now takes the position that the earliest construction of section 16 announced by his predecessors embodied an overcautious approach to bank regulation reflecting the atomsphere of the years immediately after the 1929 market crash rather than the legislative history of the Act.

The legislative history of section 16 indicates that Congress intended to leave untouched the agency practice of banks as it had previously developed. The Senate Report submitted by Senator Glass explained section 16 as follows:

Section 16.—Undertakes to broaden the national banking laws by giving national banks all powers possessed by State banks of deposit and discount organized in the States in which such national banks are located, except insofar as they may be prohibited by Federal legislation. *National banks are to be permitted to purchase and sell investment securities for their customers to the same extent as heretofore,* but hereafter they are to be authorized to purchase and sell such securities for their own account only under such limitations and restriction as the Comptroller of the Currency may prescribe, subject to certain definite maximum limits as to amount. The limitations as to dealing in investment securities are not to take effect until two years after the approval of the act.

S.Rep.No.77, 73d Cong., 1st Sess. 16 (1933) [emphasis added].

Prior to the passage of the Glass-Steagall Act, banks purchased and sold securities for the accounts of customers in a manner which, while perhaps not as extensive as AIS, considerably exceeded the narrow limits proscribed by the Comptroller's early interpretations of section 16. Banks customarily charged the account of their customers for purchases rather than have the customer make a special deposit or draw a check to cover the purchase price, charged a service fee for the transactions, and dealt in both debt and equity investments. *See e. g., Blakey v. Brinson,* 286 U.S. 254, 52 S.Ct. 516, 76 L.Ed. 1089 (1932); *McNair v. Davis,* 68 F.2d 935 (5th Cir.), *cert. denied,* 292 U.S. 647, 54 S.Ct. 780, 78 L.Ed. 1497 (1934); *Block v. Pennsylvania Exchange Bank,* 253 N.Y. 227, 170 N.E. 900 (Ct.App. 1930). The court regards AIS as consistent with the traditional agency role of commercial banks and, thus apparently within the scope of the section 16 exemption. The court would condemn AIS only if, despite its similarity to historical agency activities, it engenders

additional threats to bank solvency, threats which section 16 was intended to blunt.[5]

The prohibition against banks dealing in securities for their own account contained in section 16 was intended to eradicate certain practices which undermined bank solvency and heightened the impact of the 1929 market crash. The summary appended to the 1931 Congressional hearings on the relationship between commercial banks and the securities markets reveals that three major areas of bank activity generated the most concern. According to the summary,

> The chief points of contact between the commercial banks and the security markets [which should be eliminated] may be summarized as follows:
>
> (1) Security Loans: These include loans made to brokers and dealers, as well as to other borrowers, and may be made for a variety of purposes . . . . Such loans amounted in June, 1930, to approximately 19 per cent of the total of commercial banking assets.
>
> (2) Investments: Bonds have long constituted a component element of banking assets in this country, but only during and since the World War have bond investments of banks expanded rapidly. The opening of thrift and savings departments of commercial banks tended to stimulate to a large extent the expansion of bond holdings of the banks. On June 30, 1930, investments amounted to 22 per cent of the total commercial banking assets in this country. Included in this total are securities bought under repurchase agreements from these sellers, which are more like loans than investments in nature.
>
> (3) Security affiliates: In order to operate in the securities markets in various capacities without the restrictive influences of existing statutes, a number of banks have established affiliates which enjoy identity of ownership and management with the bank, but are incorporated separately

under State law and can freely operate as security companies. The activities of these affiliates ·in the major financial centers have assumed a very large scope in the cases of many individual institutions, and they have hitherto attracted far less attention than their importance would deserve. *Hearings Pursuant to S.Res.No.71 Before a Subcommittee of the Senate Committee on Banking and Currency,* 71st Cong. 3d Sess. 999 (1931).

The problems created by the loans, investments, and affiliates described in the subcommittee summary were thoroughly explored by the Supreme Court in *Investment Company Institute v. Camp,* 401 U.S. 617, 91 S.Ct. 1091, 28 L. Ed.2d 367 (1971). In *Investment Company Institute,* the Court decided that shares in a bank-managed investment fund sold to bank customers constituted securities within the meaning of section 16 since maintenance of the fund gave rise to the same hazards the Glass-Steagall Act was designed to curb. Consequently, banks offering shares in these funds violated the Act's mandate that banks "shall not underwrite any issue of securities or stock." 12 U.S.C. § 24 (1970).

In arriving at the conclusion that maintenance of investment funds by banks conflicted with the purposes of section 16, the Court identified several undesirable effects of the program. Especially troublesome to the majority were the facts that the funds gave banks a salesman's interest in certain investments, the banks would have a salesman's interest in the funds' performance, and the banks' prestige and credibility were threatened. Less significant dangers cited by the Court were that banks might lend money to corporations in which the fund had invested,

to the fund itself, or to customers of the fund without the objectivity necessary to make sound banking judgments, banks might divert talent and resources from commercial banking to management of the investment funds, and banks might lose the good will of customers who lost money by investing in the funds. *See* 401 U.S. at 636–38, 91 S.Ct. 1091. By contrast, the Court stated, "These are all hazards that are not present when a bank undertakes to purchase stock for the account of its individual customers . . . ." *Id.* at 638, 91 S.Ct. at 1102.

This court is of the opinion that AIS, which does not create a separate bank-managed affiliate, but merely facilitates the purchase of securities for the account of customers, substantially avoids the hazards Congress feared when it enacted the Glass-Steagall Act. AIS banks do not have have a salesman's stake in certain investments, only in a service. While banks selling shares in an investment fund are under pressure to raise capital and to increase the fund's total profit, of which they receive a set percentage, AIS banks merely sell a service to customers who have independently chosen a form of investment. Banks which offer to deduct automatically from a customer's account utility bills or mortgage payments are not selling electricity or mortgages; banks offering to deduct security purchases are not selling securities.

Banks offering AIS do not have a salesman's interest in the securities' performances. Since the banks do not manage the customers' investments, they need not prove that they perform better than anyone else. This is quite different from the situation in *Investment Company Institute,* where banks were compelled to outperform mutual funds. Under AIS, banks are in competition

---

5. Section 16 was amended in 1935. Act of August 23, 1935, § 308, 49 Stat. 709. As originally enacted, section 16 could be construed as allowing banks only to purchase debt securities for their customers. Such an interpretation would have been out of line with historical agency activity by banks and the 1935 amendment made it clear that both debt and equity securities were within the section's exemption.

with investment brokers only in terms of convenience, cost, and dependability. This sort of competition does not engender the threats to bank solvency which concerned the drafters of the Glass-Steagall Act because it is independent of any investment decision.

Perhaps the most critical distinction between AIS and the practices barred by the Glass-Steagall Act is that AIS does not threaten the prestige or credibility of banks. In managing the portfolio of an investment affiliate, banks employ the same type of judgment used in the day to day conduct of their commercial banking business. Thus, poor performance of an investment fund brings a bank's reputation directly into question. AIS involves no such day to day management and cannot in any way impugn a bank's ability to conduct its commercial banking functions.

AIS also fails to generate any of the secondary hazards cited by the Supreme Court in *Investment Company Institute.* The corporations whose securities are offered under the plan are solvent by definition and, thus, there is no need for banks offering AIS to lend them funds for the protection of customers' investments. Further, AIS contracts specify that customers participating in the plan cannot receive loans from the bank for any reason and that no purchase will be made on credit. Banks offering AIS cannot be tempted to make loans to shore up an investment affiliate since none is created. AIS banks need not divert resources from their commercial banking function to management of AIS since the system is fully computerized. Finally, AIS will not jeopardize customer good will because those whose investments go sour will have only their own judgment to blame, not the bank's.

Plaintiffs argue that AIS, because of its unique construction, poses certain additional hazards not found in *Investment Company Institute.* First, plaintiffs allege that banks can abuse the funds held by them interest-free during the thirty day "float". While it is true

that it is in the banks' interest to hold the funds as long as possible but that customers might benefit from early execution of their orders, customers are fully apprised of this potential conflict when they choose to participate in AIS. Further, abuse of the float by banks will come under the scrutiny of federal examiners. All fiduciary services by banks give rise to potential conflicts of interest resembling those created by AIS, and examiners are trained to detect them. Bank investment activity, however, creates a qualitatively different type of conflict which is generally beyond the scope of an examiner's scrutiny.

Plaintiffs maintain that customers purchasing securities under AIS are deprived of certain protective measures imposed on broker-dealers under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78hh (1970). The Act specifically excludes banks from regulation since banks are prohibited from dealing in securities. § 3(a)(4), 15 U.S.C. § 78c(a)(4) (1970). One protection allegedly deprived purchasers is the obligation on broker-dealers to investigate the suitability of any investment it recommends to individual customers. Banks offering AIS, however, state explicity that they make no recommendation concerning any investment. Indeed, as the Comptroller's letter points out, members of the NYSE offering comparable investment services do not consider themselves to be recommending investments and, therefore, do not feel obligated to make suitability investigations. Thus, investors purchasing securities from parties regulated by the Securities Exchange Act receive no better advice than AIS customers.

Plaintiffs state that brokers subject to the 1934 Act must disclose adverse information concerning securities they sell. To the extent this is true, AIS customers should receive the information. Banks offering AIS must purchase stocks through brokers and, thus, would be entitled to full disclosure. As agents, the banks would then be obligat-

ed to pass such information on to their principals, the customers. Although the banks themselves may be privy to inside information they need not disclose, the AIS customer will receive no less information than an investor who deals directly with a securities broker.

Brokers subject to the Securities Exchange Act must obtain the "best execution" for their customers and deliver the security promptly. AIS customers are fully informed that they are not receiving this type of service. The benefit received for giving up these features is lower commission charges. Customers willing to pay for best execution and prompt delivery will not use AIS.

Plaintiffs' final point is that AIS customers do not receive the protections provided in the Securities Investor Protection Act of 1970, 15 U.S.C. §§ 78o, 78aaa–78lll (1970). SIPA establishes accelerated procedures under which a customer can recover property left with a broker who has subsequently become insolvent and provides insurance on non-identifiable customer property up to $50,000, of which $20,000 can represent cash. AIS customers are similarly protected by the Federal Deposit Insurance Act, 12 U.S.C. §§ 264, 1728, 1811–31 (1970). FDIC insurance is now $40,000 for each depositor's account. The pooled fund held for 30 days could be considered either a part of each individual customer's account or a trust fund. In either event, the customer's cash is insured up to $40,000. Securities retained by an insolvent bank would be immediately identifiable due to AIS's computerized accounting, and, thus, would not be subject to claims of the bank's creditors.

In addition to arguing that AIS violates the Glass-Steagall Act for the reasons set forth in *Investment Company Institute* and for the further reasons just discussed, plaintiffs maintain that AIS constitutes a security as defined by the Supreme Court in *SEC v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) and subsequent cases interpreting the Securities Act of 1933, 15 U.S.C. § 77a et seq. (1970). This argument has no place in this litigation. The Supreme Court's opinion in *Investment Company Institute* was devoted principally to defining the term "security" as used in the Glass-Steagall Act, and not once does the opinion make reference to *Howey* or its progeny. The Securities Act has a different legislative history and different underlying policies from the Glass-Steagall Act. The material question in the instant case is whether AIS comports with the policies of the Glass-Steagall Act, and the court believes that question has been adequately analyzed above.

The court concludes that the Comptroller's interpretation of the Glass-Steagall Act is both reasonable and correct as a matter of law, and, consequently will grant summary judgment for the defendant. An appropriate judgment accompanies this Memorandum Opinion.

John R. CAOLA et al.

v.

UNITED STATES of America et al.

Civ. No. H–75–110.

United States District Court,
D. Connecticut.

Dec. 4, 1975.

L. Patrick Gray, III, James F. Brennan, Jr., Thomas B. Wilson, Groton, Conn., for plaintiffs.

Peter C. Dorsey, U. S. Atty., Marjorie Wilhelm, Asst. U. S. Atty., Hartford, Conn., Lt. Richard Stearns, Office of Judge Advocate General, Dept. of the Navy, Washington, D. C., for defendants.

## MEMORANDUM OF DECISION

### BLUMENFELD, District Judge.

These actions by 159 plaintiffs, all enlisted men in the United States Navy, have been consolidated. The plaintiffs seek habeas corpus relief or, in the alternative, money damages under the Tucker Act, 28 U.S.C. § 1346(a)(2), for the alleged breach of military enlistment contracts entered into by each of them. The defendants are the United States, the Secretary of Defense,[1] the Secretary of the Navy, and Vice Admiral Watkins, U. S. Navy, the Chief of Navy Personnel.

Each of the plaintiffs, between 1970 and 1973, enlisted for a period of four years of active duty in the United States Navy by signing a similarly worded enlistment contract. Either concurrently with the signing of their respective enlistment contracts, or shortly thereafter,[2] each plaintiff signed a U. S. Navy form entitled: "AGREEMENT TO EXTEND ENLISTMENT, NAVPERS, 601–1A/NAVCOMPT 513 (Rev. 6–63)," obligating himself for an over-all period of six years of active naval service. The relevant language of the "AGREEMENT TO EXTEND ENLISTMENT" is set forth in the margin.[3] In return for extending their enlistment, these plaintiffs were to receive training in a designated military specialty 1304.10 WB, a "critical skill," and to obtain accelerated advancement and promotion. At the time each plaintiff agreed to extend his enlistment for an additional 24 months there was in effect a federal statute (37 U.S.C. § 308 [1965]), permitting payment of a Regular Reenlistment Bonus and also a Variable Reenlistment Bonus (V.R.B.) to those members of the armed services who reenlisted for an additional two years. The V.R.B. was designed to assist in obtaining and maintaining an adequate career-manning level in designated specialties,[4] and could be paid in an amount

1. James Schlesinger has resigned as Secretary of Defense. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, his successor, Donald Rumsfeld, is automatically substituted as a defendant.

2. While in recruit training, or at a Class A U. S. Navy service school.

3. The agreement reads:
"I * * *, in consideration of the pay, allowances, and benefits which will accrue to me during the continuances of my service, voluntarily agree to extend my enlistment as authorized by Section 509, of Title 10, United States Code, and the regulations issued pursuant thereto. I voluntarily agree to extend my enlistment for a period of 24 months from the date of expiration thereof, subject to the provisions and obligations of my said contract of enlistment of which this, my voluntary agreement, shall form a part. 'REASON FOR EXTENSION: Training (Nuclear Field Program or Advanced Electronics (AEF) Field Program). AUTH: BUPERSMAN 1050300. I understand that this extension becomes binding upon execution and thereafter may not be canceled except as set forth in BUPERSMAN 1050150." [sic]

4. Dept. of Defense Directive 1304.10 Aug. 15, 1968. Navy policy was set forth in BUPERS (Bureau of Personnel) Instruction 1133.18E, March 23, 1972.

up to four times the regular reenlistment bonus.[5] None of the enlistment or reenlistment documents contains any reference to a V.R.B.

By 1974 the Secretary of Defense and the several service secretaries had agreed that a reenlistment bonus was no longer needed as an incentive to maintain desired manpower levels, except in "critical skill" categories.[6] They so informed the Armed Services Committees of both Houses. As a result, Congress enacted, and the President signed, Public Law 93–277 (May 10, 1974). The new law eliminated both the regular reenlistment bonus and the V.R.B., theretofore provided for under § 308(a) and (g) respectively, and substituted a new Selective Reenlistment Bonus (S.R.B.) for the V.R.B. for those with critical skills who would reenlist for an additional four-year term.[7]

Each of the plaintiffs has received the promised schooling and obtained accelerated advancement to the rank of petty officer. Each now possesses a designated "critical skill." Yet, none of them have received the bonuses provided for by 37 U.S.C. § 308(g). The defend-

ants argue that because none ⌐ the plaintiffs had entered into his extended enlistment period before § 308(a) and (g) were superseded by P.L. 93–277, the Navy is under no legal obligation to pay the bonuses. The plaintiffs, on the other hand, claim that they should either be paid those bonuses or be released from further service now or upon the expiration of their original enlistment period.

There are no disputed issues of material fact, and both parties have moved for summary judgment.

### I.

#### *Jurisdiction*

This action is brought under the fifth amendment to the Constitution of the United States; 28 U.S.C. § 2241; 28 U.S.C. § 1346(a)(2); 28 U.S.C. § 1361; 28 U.S.C. § 2201; and 28 U.S.C. § 2202.

### II.

#### *The Contract*

◼ The first issue presented is whether the "AGREEMENT TO EX-

---

"5. Policy. The general concept and intent of the VRB is to provide a flexible, additional pay incentive to alleviate significant shortages of career petty officers in designated ratings and NECs [Navy Enlisted Classification] by obtaining additional first-term reenlistments.

a. The Variable Reenlistment Bonus, because of its superior effectiveness as a first-term reenlistment incentive, will be used as the principal method of attaining an adequate Career Manning Level in presently undermanned ratings and NECs. The major source of additional career personnel is the additional first-term reenlistments that can be obtained by the award of extra pay in the form of VRB.

b. It is the intent of the Chief of Naval Personnel that, in utilizing the Variable Reenlistment Bonus as a first-term reenlistment incentive, continued and increasing attention be given to quality performance in those who are reenlisted. Strict adherence to the Reenlistment Eligibility Criteria in reference (d) is required if the professional quality of the career force is to be improved."

5. Amounts of the V.R.B. varied according to the particular skills involved, based upon what men with those skills could be expected to earn in private industry. The Navy Department classified the skills and assigned bonus amounts to each classification according to the shortages of career manpower. *See* BUPERS 1133.18E.

6. *See* 2 U.S.Code Cong. & Admin.News 1974, at 2985–86.

7. "Objective. The Selective Reenlistment Bonus is a retention incentive paid to enlisted members serving in certain selected ratings who reenlist or extend their enlistments for a period of at least three years. The objective of the bonus is to increase the number of reenlistments in those ratings characterized by retention levels insufficient to adequately man the career force. Because of its superior effectiveness as a retention incentive, the Selective Reenlistment Bonus will be used as the principal monetary incentive for attaining adequate Navy career manning."
Exh. K, BUPERS memo from SECNAV to ALNAV, May 31, 1974.

TEND ENLISTMENT" was a contract. While the plaintiffs expressly disclaim that any misrepresentations were made to them, they do contend that the central undertaking of the Navy was to induce them to learn critical military skills, and to extend their periods of enlistment. The BUPERS, which, as regulations having the force of law, are binding on all Naval personnel, *Rehart v. Clark,* 448 F.2d 170, 173 (9th Cir. 1971), fully support that contention. Department of Defense Instruction No. 1304.15 (Sept. 3, 1970) describes the Administration of Variable Reenlistment Bonus and Proficiency Pay Programs.[8]

a member for receipt of the Variable Reenlistment Bonus.