SECURITIES INDUSTRY
ASSOCIATION,
Plaintiff,

v.

COMPTROLLER OF THE CURRENCY,
et al., Defendants.

Civ. A. No. 82–2865.

United States District Court,
District of Columbia.

Nov. 2, 1983.

John M. Liftin, James B. Weidner, Harry M. Yohalem, Thomas M. Shoesmith, Rogers & Wells, Washington, D.C., William J. Fitzpatrick, New York City, Donald J. Crawford, Securities Industry Association, Washington, D.C., for plaintiff.

Alphonse M. Alfano, Harriet Kerwin, Civil Div., U.S. Dept. of Justice, and Brian W. Smith, Ronald Glancz, Donald N. Lamson, Ginger S. Baraum, Washington, D.C., for defendants.

Leonard H. Becker, Arnold & Porter, Washington, D.C., amicus curiae for Planter Nat. Bank of Memphis.

B. Boyd Hight, O'Melveny & Myers, Washington, D.C., amicus curiae for Security Pacific Nat. Bank.

Robert S. Rifkind, Cravath, Swain & Moore, New York City, amicus curiae for N.Y. Clearing House Ass'n.

William H. Smith, American Bankers Association, Washington, D.C., amicus curiae for American Bankers Ass'n.

## MEMORANDUM OPINION

FLANNERY, District Judge.

This matter is before the court on cross-motions for summary judgment. Plaintiff Securities Industry Association ("SIA"), a national trade association representing more than five hundred securities brokers, dealers and underwriters, challenges the actions of the Comptroller of the Currency, C.T. Conover, in approving the applications of two national banks for the establishment or purchase of discount securities brokerage subsidiaries. For the reasons set forth below, plaintiff's motion is granted in part and the Comptroller's decision is reversed.

*Facts*

On June 23, 1982 Union Planters National Bank of Memphis applied to the Comptroller for approval of the acquisition by Union Planters of Brenner Steed and Associates, Inc., a discount brokerage business in Memphis, Tennessee. In its application Union Planters said it intended to offer securities brokerage services through Brenner Steed at certain branch offices of Union Planters in Tennessee, at affiliated banks in Tennessee, and at correspondent banks in Tennessee and six other states.

On July 2, 1982 Security Pacific National Bank applied to the Comptroller for approval of its proposed establishment of a new operating subsidiary to provide discount brokerage services. In its application Security Pacific said the new subsidiary would offer brokerage services at certain Security Pacific branch offices and might in the future offer those services at non-branch offices in California and other states. The new subsidiary will process and extend margin loans.

Brenner Steed is, and the Security Pacific subsidiary will be, "discount" brokerages, which will buy and sell securities solely as agent, on the order and for the account of customers. Neither will purchase or sell securities for its own account, nor engage in underwriting, nor give investment advice. "Discount" brokers are so characterized because their commissions are significantly lower than those charged by full-service brokers who, in addition to trading on behalf of customers, offer investment advice.

On August 26, 1982 the Comptroller approved the Security Pacific application. On September 20, 1982 the Comptroller approved the Union Planters application, and in September, 1982 Union Planters acquired Brenner Steed. This action followed.

*Discussion*

SIA argues that the Comptroller's decisions should be set aside as in excess of his statutory authority for two reasons. First, the operation of a brokerage business by a national bank or its affiliate violates Sections 16 and 21 of the Glass-Steagall Act of 1933, 12 U.S.C. §§ 24 Seventh, 378. Second, the operation of a brokerage business by a national bank or its affiliate at offices other than those branches which the bank is allowed to establish consistent with state law violates the McFadden Act, 12 U.S.C. §§ 36, 81. The court addresses these two arguments below.

### A. *Standard of review*

▮ The degree of deference due the Comptroller was described by this court in *New York Stock Exchange v. Smith*, 404 F.Supp. 1091 (D.D.C.1975), *vacated on other grounds*, 562 F.2d 736 (D.C.Cir.1977), *cert. denied*, 435 U.S. 942, 98 S.Ct. 1520, 55 L.Ed.2d 538 (1978) (*"NYSE"*):

> At the outset, the court notes that it gives "great weight" to the Comptroller's ruling. The Supreme Court has consistently held that reasonable constructions of regulatory statutes by the agencies charged with enforcement of those statutes are to be respected by reviewing courts.... The Comptroller's [ruling] will be respected, even if the court would have reached a different result were this a question of first impression.

404 F.Supp. at 1096 (Citations omitted). The reasons for the deference accorded the Comptroller are similar to those given by the court in *A.G. Becker, Inc. v. Board of Governors*, 693 F.2d 136 (D.C.Cir.1982), explaining its deference to the opinions of that other federal body charged with banking regulation, the Board of Governors of the Federal Reserve System. In *A.G. Becker* plaintiffs, including SIA, challenged the Board's decision to allow Bankers Trust Company to act as agent in the sale of commercial paper. In upholding the Board's decision, and in reversing the district court, the court of appeals explained that the Board's decision warranted deference because of the scope of the Board's authority, its expert knowledge of commercial banking, and its application of general, undefined statutory terms to particular facts. The court wrote:

The regulatory structure of the banking laws must be permitted to adapt to the changing financial needs of our economy. Congress has delegated to the Federal Reserve Board, rather than to this court, the complex task of applying the Act's general proscriptions to the current business reality. We must therefore defer to the Board's interpretation of the statute if that interpretation is reasonable.

693 F.2d at 141. For the same reasons, this court must uphold the Comptroller's decision if it is reasonable.

### B. *The Glass-Steagall Act*

#### 1. *The Act does not limit bank affiliates to securities transactions solely for pre-existing customers*

SIA argues that Glass-Steagall permits banks to provide brokerage services only to pre-existing, bona fide bank customers. Glass-Steagall, says SIA, intended to erect impenetrable barriers between commercial banks and investment banks in order to avoid the kind of rampant speculation of the 1920's which brought the banking system to the brink of collapse, when banks would use depositors' money to push speculative securities out on the market. In support of its argument SIA points to two provisions of Glass-Steagall. Section 21, 12 U.S.C. § 378, prohibits any organization "engaged in the business of issuing, underwriting, selling or distributing, at wholesale or retail ... securities ..." from engaging at the same time in the banking business.[1] Discount brokers engage in the retail purchase and sale of securities and so, argues the SIA, are prohibited from being part of a banking business at the same time.

---

**1.** Section 21 of the Glass-Steagall Act, 12 U.S.C. § 378, provides in pertinent part:

> [I]t shall be unlawful ... [f]or any person, firm, corporation, association, business trust, or other similar organization, engaged in the business of issuing, underwriting, selling or distributing, at wholesale or retail, or through syndicate participation, stocks, bonds, debentures, notes, or other securities, to engage at the same time to any extent whatever in the business of receiving deposits subject to check

> or to repayment upon presentation of a passbook, certificate of deposit, or other evidence of debt, or upon request of the depositor: *Provided,* That the provisions of this paragraph shall not prohibit national banks or State banks or trust companies ... or other financial institutions or private bankers from dealing in, underwriting, purchasing, and selling investment securities to the extent permitted to national banking associations by the provisions of section 24 of this title.

Section 16, 12 U.S.C. § 24 Seventh, limits bank brokerage activity to that "upon the order, and for the account of, customers..." [2] This section, says SIA, is a very limited exception to the otherwise unyielding barrier between commercial and investment banking established by Glass-Steagall, and exists only in order to accommodate existing bank customers. In support of its position, SIA cites several early Comptroller opinions holding that Section 16 limits bank brokerage transactions to those performed for customers of the bank whose relationship with the bank exists independently of the securities transaction. *See, e.g.,* 1 *Bulletin of the Comptroller of the Currency* No. 2 at 2 (Oct. 26, 1936). Although the first such opinion dates from 1936, SIA maintains that the Comptroller has affirmed that interpretation of Section 16 until today. The SIA concedes that the Comptroller modified his position in 1974 when, in approving an application to provide Automatic Investment Services, a ruling upheld by this court in *New York Stock Exchange v. Smith, supra,* the Comptroller reversed his prior interpretations to say that "accommodation" did not mean that banks could not charge customers for the brokerage service. But the Comptroller left untouched, says SIA, the requirement that the customer relationship exist independent of the securities transaction conducted as part of the brokerage services.

■ The court is not persuaded by SIA. The language of Section 16 limiting bank securities to those "for the account of customers" does not limit bank brokerage activity, but serves to distinguish such activity from buying and selling of securities by the bank for its own account. Despite the exhaustive cataloging in the legislative history of Glass-Steagall of the ills arising out of the previous intermingling of investment and commercial banking, *see, e.g.,* S.Rep.

No. 77, 73rd Cong., 1st Sess. 8–10 (1933), there is no mention of limiting bank brokerage activity. On the contrary, the one mention appearing in the legislative history says that Glass-Steagall will permit national banks to sell and buy securities for their customers "to the same extent as heretofore." *Id.* at 16. And as the Comptroller demonstrates, through citation both to earlier case law and secondary sources, prior to the passage of Glass-Steagall banks offered brokerage services to members of the general public, and not just to existing customers. *See, e.g., Blakey v. Brinson,* 286 U.S. 254, 52 S.Ct. 516, 76 L.Ed. 1089 (1932); *McNair v. Davis,* 68 F.2d 935 (5th Cir.1934), *cert. denied,* 292 U.S. 647, 54 S.Ct. 780, 78 L.Ed. 1497 (1934).

■ The early opinions of the Comptroller relied on by SIA embody "an overcautious approach to bank regulation reflecting the atmosphere of the years immediately after the 1929 market crash..." *NYSE, supra,* 404 F.Supp. at 1097, and have gradually been disavowed by the Comptroller in the intervening decades. As the Comptroller stated in 1974, commenting on his reversal of an earlier decision disallowing bank charges for brokerage services:

> This [earlier] view, like many others expressed by regulators, in the immediate post-depression decades, was designed to be ultra-conservative and to confine banks as narrowly as possible in their activities. However, in this regard, the office apparently went further in the direction of conservatism than did the Congress, since neither the word nor the idea of the "accommodation" limitation appears in the statute or in any committee or floor comments.

Letter from James E. Smith, Comptroller of the Currency, to G. Duane Vieth (June 10, 1974), *reprinted in* [1973–78] Fed.Banking L.Rep. (CCH ¶ 96,272).

---

**2.** Section 16 of the Glass-Steagall Act, 12 U.S.C. § 24, Seventh, provides in pertinent part:

> The business of dealing in securities and stock by the association shall be limited to purchasing and selling such securities and stock without recourse, solely upon the order, and for the account of, customers, and in no case for its own account, and the association will not underwrite any issue of securities or stock: *Provided,* That the association may purchase for its own account investment securities under such limitations and restrictions as the Comptroller of the Currency may by regulation prescribe.

The court's understanding of the scope of the prohibitions of Glass-Steagall is reinforced by analysis of Section 20 of the statute, 12 U.S.C. § 377, which provides that a bank may not be affiliated with any organization which is "engaged principally in the issue, flotation, underwriting, public sale, or distribution of stocks, bonds, debentures, notes or other securities."[3] The language of Section 20 makes clear that the line Congress sought to draw between commercial and investment banking did not prohibit bank affiliate brokerage activity. The prohibition of Section 20 is clearly aimed at the investment banking business by which large blocks of securities newly-issued by corporations are brought by investment banks for resale to the public. In such a transaction the investment banks buy for their own account and assume the risk that the market may not be receptive to these securities. Such activities are, therefore, fundamentally different from brokerage activities, where the broker buys and sells only as agent and for the account of the customer. The phrase "at retail" in the statute may not be read to encompass brokerage activities because it must be read consistently with the other words in the same phrase. *Third National Bank in Nashville v. Impac, Ltd.*, 432 U.S. 312, 322, 97 S.Ct. 2307, 2313, 53 L.Ed.2d 368 (1977).

The court's conclusion is in accord with the opinion of the Board of Governors of the Federal Reserve Board approving the purchase by Bank America Corporation, a bank holding company regulated by the Board pursuant to the Bank Holding Company Act, 12 U.S.C. § 1841 *et seq.*, of the discount brokerage services through its wholly-owned subsidiary Charles Schwab & Co., Inc., 69 Fed.Res.Bull. 105 (1983). In its opinion the Board analyzed Sections 20 and 16 of the Glass-Steagall Act and concluded that the acquisition and operation of a discount brokerage service by a member bank was consistent with both the language and purpose of the Act. The Board's opinion was affirmed by the Second Circuit in *Securities Industry Association v. Board of Governors of the Federal Reserve System*, 716 F.2d 92 (2d Cir.1983).

2. *The requirement that bank purchases and sales of securities be "without recourse" does not prohibit brokerage activity by bank subsidiaries*

█ Section 16 of Glass-Steagall limits bank securities dealings to buying and selling of securities "without recourse." SIA contends that the phrase "without recourse" must not be given a technical, commercial meaning, but must be read broadly. SIA relies on the case of *Awotin v. Atlas Exchange Bank of Chicago*, 295 U.S. 209, 55 S.Ct. 674, 79 L.Ed. 1393 (1935), where the Supreme Court wrote:

The phrase is broader than a mere limitation upon the power to contract, although embracing that limitation. It is a prohibition of liability, whatever its form, by way of "recourse" growing out of the transaction of the business.

A brokerage subsidiary of a national bank could become contingently liable on a securities transaction, argues SIA, if the customer buyer failed to pay for the securities or if the customer seller failed to deliver the securities as promised. Such liability is prohibited by the "without recourse" limitation, says SIA.

SIA's reliance on *Awotin* is misplaced. In that case banks had agreed by separate contract to repurchase bonds at maturity at par plus accrued interest—the very sort of guarantee the Comptroller admits is prohibited by Section 16, but which is absent from a brokerage transaction. The *Awotin* court simply held that the "without recourse" language reached "any other form of contract by which the bank assumes the risk of loss which would otherwise fall on

---

**3.** Section 20 of the Glass-Steagall Act, 12 U.S.C. § 377, provides in pertinent part:

[N]o member bank shall be affiliated ... with any corporation, association, business trust, or other similar organization engaged princi-

pally in the issue, flotation, underwriting, public sale, or distribution at wholesale or retail or through syndicate participation of stocks, bonds, debentures, notes, or other securities.

the buyer of securities." 295 U.S. at 211–12, 55 S.Ct. at 675–76. This is not the risk a bank incurs in a brokerage transaction.

As the Federal Reserve Board explained in its *Bank America* decision: "The ordinary commercial meaning of 'without recourse' indicates that section 16 prohibits a bank from assuming the liability of endorser or maker with respect to the securities bought or sold as agent of the customer." *In re Bank America Corp.*, 69 Fed.Res. Bull. at 115, n. 50. The Second Circuit upheld that determination, writing:

> [W]e do not think that Schwab trades "without recourse" simply because it faces the kind of incidental liability to which SIA refers. Schwab can maintain actions for breach of contract against customers who fail to pay for or deliver securities and thus, giving the words their ordinary meaning, is not "without recourse" against such customers.

*Securities Industry Association v. Board of Governors of the Federal Reserve System, supra*, 716 F.2d 92 at 100 n. 4.

In accordance with the foregoing, the court holds that the Glass-Steagall Act does not prohibit the ownership and operation by national banks of subsidiaries engaged in the brokerage business.

### C. *The McFadden Act*

The National Bank Act of 1864, which created national banks, originally allowed national banks to operate only out of one central office named in the bank's certificate of incorporation. The statute provided:

> The usual business of each national banking association shall be transacted at an office or banking-house located in the space specified in its organization certificate.

R.S. 5190 (1864).

Later, state banks began to establish branch offices. In order to equalize competition between state and national banks Congress amended the banking laws in 1972 in the McFadden Act to provide that national banks could carry on their general business not only at the central office, but also at branch offices which they could establish, upon Comptroller approval, to the extent which state law permitted state banks to establish branches. Section 8 of the McFadden Act amended the National Bank Act to provide:

> The general business of each national banking association shall be transacted in the place specified in its organization certificate and in the branch or branches, if any, established or maintained by it in accordance with [12 U.S.C. § 36].

R.S. 5190, 12 U.S.C. § 81.

"Branches" were defined in Section 36(f) of the Act:

> The term "branch" as used in this section shall be held to include any branch bank, branch office, branch agency, additional office, or any branch place of business ... at which deposits are received, or checks paid, or money lent.

12 U.S.C. § 36(f).[4]

SIA argues that, if it is legal for national banks to carry on brokerage activity through their subsidiaries, then at the very least the banks' operation of their brokerages must be limited to the branch offices they are presently permitted. Both Union

---

4. 12 U.S.C. § 36 provides, in pertinent part:

(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks.

\*    \*    \*    \*    \*    \*

(f) The term "branch" as used in this section shall be held to include any branch bank, branch office, branch agency, additional office, or any branch place of business at which deposits are received, or checks paid, or money lent.

Planters and Security Pacific indicated their intention to operate their brokerage subsidiaries at non-branch offices within their respective states, as well as at offices in other states across the country. Still, the Comptroller approved their applications. The Comptroller's decision, contends SIA, exceeded his authority and is contrary to the branching restrictions of the McFadden Act and so must be overturned.

### 1. *Standing*

■ The Comptroller responds to SIA's challenge by arguing first that SIA is without standing to bring it. Any additional injury which SIA might suffer from the location of brokerage subsidiary offices at places other than the bank's central office and chartered branches is speculative, says the Comptroller. And the McFadden Act branching restrictions were designed to promote competitive equality between state and national banks, not to protect securities dealers. SIA can show no injury and is not within the zone of interests sought to be protected by the Act, concludes the Comptroller, and therefore is without standing to challenge the Comptroller's decision under the Act.

The Comptroller's argument is not persuasive. In *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) (*"Data Processing"*), the Supreme Court held that an organization of providers of data processing services had standing to challenge a ruling by the Comptroller permitting national banks to make data processing services available to other banks and to bank customers. The organization had standing, the court explained, in part because they had alleged that "competition by national banks in the business of providing data processing services might entail some future loss of profits for petitioners." 397 U.S. at 152, 90 S.Ct. at 829. Similarly, SIA has alleged that its members' profits will suffer if national banks are allowed to operate brokerage subsidiaries in competition with them. And it is obvious that the greater number of offices from which banks are allowed to conduct

their brokerage business, the greater will be the inroads the banks will be able to make into the business of SIA's members. Accordingly, SIA has alleged sufficient injury to confer standing.

Nor need there be any explicit expression in the statute or its legislative history for the court to find that SIA is within the zone of interests protected by the McFadden Act. In *Arnold Tours, Inc. v. Camp*, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970), the Supreme Court reversed the dismissal for lack of standing of a complaint by independent travel agents who challenged the Comptroller's ruling that national banks may provide travel services for their customers. The court, relying on *Data Processing*, noted "a growing trend 'toward enlargement of the class of people who may protest administrative action.'" 400 U.S. at 46, 91 S.Ct. at 159. The court in *Data Processing* "did not rely on any legislative history showing that Congress desired to protect data processors alone." *Id.* The question is whether a challenged statute "'arguably brings a competitor within the zone of interests protected by it.'" *Id.*

The only mention of *Data Processing* of the legislative history of the statutory provision at issue was that the provision was a "response to the fears expressed by a few senators, that without such a prohibition, the bill would have enabled 'banks to engage in a nonbanking activity,' and thus constitute 'a serious exception to the accepted public policy which strictly limits banks to banking.'" *Arnold Tours, supra*, 400 U.S. at 46 n. 3, 91 S.Ct. at 159 n. 3, quoting *Data Processing, supra*, 397 U.S. at 155, 90 S.Ct. at 830 (citations omitted). Similarly here, the branching restrictions of the McFadden Act, read in conjunction with the original restrictions of the National Bank Act limiting national banks to one central office, evince the intent of Congress to curb the scope of national banks' activities. To be sure, the McFadden Act restricts national banks not in the type of business they may conduct but where they may conduct it. Still, attempts to exceed

those curbs would harm SIA's members just as the data processors in *Data Processing* and the tour operators in *Arnold Tours.* Accordingly, SIA is arguably within the zone of interests sought to be protected by the Act.

2. *The McFadden Act limits the business of a national bank's discount brokerage subsidiary to the bank's central office and chartered branches*

■ On the merits, the Comptroller argues that the branching restrictions of the McFadden Act apply only to the three activities which are enumerated in the definition of "branch" within the statute: receipt of deposits, payment on checks, or lending money. Only one of these activities will even arguably exist at the brokerage offices—the lending of money when the brokerage extends margin loans to customers, but those loans will only "originate" at the brokerage offices. Final approval will be given at the central office, and under Comptroller regulations, 12 C.F.R. § 6.7380, the origination of a loan later approved at another office does not constitute the lending of money by the originating office. Because brokerage activities are not among those enumerated in the Act, says the Comptroller, its restrictions do not apply. In any event, he concludes, the Act limits only the branches which a national bank may have within the state of its central office. No restrictions apply to offices outside that state.

After careful consideration of the Comptroller's decision, and with due regard for the deference owed him, the court finds that the Comptroller exceeded his authority, in contravention of law, in approving the applications of Union Planters and Security Pacific without regard to the branching restrictions of the McFadden Act. The Comptroller's literal reading of the statute is contradicted, first, by the legislative history of the Act. Shortly after the Act's passage, its sponsor, Representative McFadden, placed a section-by-section analysis of it in the Congressional Record. That analysis described the definition of "branch" in Section 36(f) as follows:

[Section 36(f)] defines the term "branch." Any place outside of or away from the main office where the bank carries on its business of receiving deposits, paying checks, lending money, or *transacting any business carried on at the main office* is a branch if it is legally established under the provisions of this act.

68 Cong.Rec. 5816 (1927) (emphasis added). Although the Comptroller urges the court to disregard Representative McFadden's remarks because they came after the Act's passage, other courts have cited the above passage as authoritative. *See, e.g., First National Bank in Plant City v. Dickinson,* 396 U.S. 122, 134 n. 8, 90 S.Ct. 337, 343 n. 8, 24 L.Ed.2d 312 (1969); *Independent Bankers Association of America v. Smith,* 534 F.2d 921, 931–32 (D.C.Cir.1976).

The Supreme Court has indicated that a broader, more flexible interpretation must be made of the statute than that followed by the Comptroller. In *Dickinson, supra,* the Comptroller gave a national bank in Florida permission to operate an armored car and a secured receptacle in a shopping center, both staffed by tellers, for the receipt of deposits and cashing of checks by customers. State banking regulators ordered the bank to stop providing the off-premises services because Florida law prohibits branch banking altogether. The bank brought suit for declaratory and injunctive relief in federal court. The Supreme Court held that the off-premises services constituted a "branch" in violation of the McFadden Act, and in doing so explained:

Although the definition may not be a model of precision in part due to its circular aspect, it defines the minimum content of the term "branch" by use of the word "include". The definition suggests a *calculated indefiniteness* with respect to the outer limits of the term. However, the term "branch bank" at the very least includes any place for receiving deposits or paying checks or lending money apart from the chartered premises; *it may include more.*

396 U.S. at 135, 90 S.Ct. at 344 (emphasis added).

Other courts faced with similar questions have expressly held that bank offices at which business is conducted other than the

three functions enumerated in the Act nonetheless are "branches" within Section 36 and therefore subject to state law restrictions on branch locations. In *St. Louis County National Bank v. Mercantile Trust Company National Association,* 548 F.2d 716 (8th Cir.1976), *cert. denied,* 433 U.S. 909, 97 S.Ct. 2975, 53 L.Ed.2d 1093 (1977), the Comptroller approved the establishment by Mercantile of a trust office in a St. Louis suburb. A state bank brought suit for declaratory and injunctive relief, contending that the trust office had been established in violation of state law limiting bank branches. Mercantile argued, as does the Comptroller here, that because the trust office did not receive deposits, pay checks, or lend money, the McFadden Act did not apply. The Eighth Circuit rejected the argument, affirming the district court grant of injunctive relief, concluding "the three routine banking functions delineated in Section 36(f) are not the only indicia of branch banking." 548 F.2d at 719. Examining the services provided by the trust office, the court found that the office performed services routinely offered at the bank's main office and increased convenience for the bank's customers. Based on those facts, the court held that the trust office was a "branch" within Section 36(f). *Cf. Colorado v. First National Bank of Fort Collins,* 540 F.2d 497, 499–500 (10th Cir.1976) ("accepting deposits, or paying checks, or lending money are not the only indicia of branch banking. The typical bank at the present time provides many other services"), *cert. denied,* 429 U.S. 1091, 97 S.Ct. 1102, 51 L.Ed.2d 537 (1977).

This court has held that the Glass-Steagall Act permits national banks to operate discount brokerage subsidiaries. The provision of brokerage services as described in the Security Pacific and Union Planters applications—at numerous locations in many states—is clearly aimed at attracting and servicing customers conveniently. The brokerage business, therefore, is within the category of "general business" which national banks may conduct at their main office and, as such, is subject to the branching restrictions in 12 U.S.C. § 81 and 12 U.S.C. § 36.

The Comptroller's final argument that the McFadden Act restrictions apply only to branches within the state where the bank has its central office must also be rejected. It ignores completely the fact that the McFadden Act was a limited extension of the National Banking Act provisions for the location of bank offices, which previously had allowed national banks only one central office. Never have national banks been authorized under the National Bank Act to maintain offices outside their home state.

In accordance with the foregoing, the court holds that an office of a national bank for the conduct of discount brokerage activities is a "branch" within the definition of Section 36(f) of the McFadden Act, subject to state law restrictions on the establishment of bank branch offices. The Comptroller's decision to the contrary, in approving the applications of Security Pacific and Union Planters for the establishment or purchase of a discount brokerage subsidiary without regard to the branching restrictions of the McFadden Act, shall therefore be reversed.

The parties shall submit proposed Judgments in accordance with this Opinion within ten days of the date of its filing.