NEW YORK STOCK EXCHANGE, INC.
and Investment Company
Institute, Appellants,

v.

Robert BLOOM, Acting Comptroller
of the Currency.

No. 76–1235.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 4, 1977.

Decided July 19, 1977.

Rehearing Denied Aug. 31, 1977.

John E. Nolan, Jr., Washington, D. C., with whom James L. Wolf, G. Duane Vieth and James W. Jones, Washington, D. C., were on the brief, for appellants.

Harry Silver, Atty., Dept. of Justice, Washington, D. C., for appellee. Barbara Allen Babcock, Asst. Atty. Gen. and Ronald R. Glancz, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellee. Michael H. Stein and Donald Etra, Attys. for Dept. of Justice, Washington, D. C., also entered appearances for appellee.

John M. Liftin and George C. Smith, Washington, D. C., filed a brief on behalf of the Securities Industry Association as amicus curiae urging reversal.

Before WRIGHT, McGOWAN and TAMM, Circuit Judges.

Opinion for the Court filed by Circuit Judge, McGOWAN.

Concurring Opinion filed by Circuit Judge, WRIGHT.

McGOWAN, Circuit Judge:

■ Appellants New York Stock Exchange, Inc. (NYSE) and Investment Company Institute (ICI) sued in the District Court for declaratory and injunctive relief

against two informal expressions of opinion by the Comptroller of the Currency to Security Pacific National Bank (Security Pacific) that the latter's proposed automatic stock purchasing service would not violate sections 16 and 21 of the Banking Act of 1933 (the Glass-Steagall Act), 12 U.S.C. §§ 24, 378 (1970). The District Court granted summary judgment on the merits in favor of the Comptroller, after rejecting his threshold contentions that the actions in question were not ripe for review, and that appellant lacked standing and had failed to join indispensable parties. *New York Stock Exchange, Inc. v. Smith,* 404 F.Supp. 1091 (D.D.C.1975). We find the challenged opinions to be unripe for judicial scrutiny.

I

Sections 16 and 21 of the Glass-Steagall Act impose strict limitations on the authority of banks to purchase, sell, issue, underwrite, distribute, or otherwise deal in stocks and securities. Section 16 provides in pertinent part:

> The business of dealing in securities and stock by [a national banking] association shall be limited to purchasing and selling such securities and stock without recourse, solely upon the order, and for the account of, customers, and in no case for its own account, and the association shall not underwrite any issue of securities or stock: *Provided,* That the association may purchase for its own account investment securities under such limitations and restrictions as the Comptroller of the Currency may by regulation prescribe.

12 U.S.C. § 24(7) (1970). And section 21 specifies:

> (a) . . . it shall be unlawful—
>
> (1) For any person, firm, corporation, association, business trust, or other similar organization, engaged in the business of issuing, underwriting, selling, or distributing, at wholesale or retail, or through syndicate participation, stocks, bonds, debentures, notes, or other securi-

ties, to engage at the same time to any extent whatever in the business of [deposit banking]: *Provided,* That the provisions of this paragraph shall not prohibit national banks . . . from dealing in, underwriting, purchasing, and selling investment securities to the extent permitted . . . by the provisions of section 24 of this title . . . .

*Id.* § 378(a)(1).

On February 12, 1973, Security Pacific wrote to the Comptroller, requesting his opinion as to whether the "Automatic Investment Service" (AIS) which the bank was proposing to establish would be consistent with sections 16 and 21 of the Glass-Steagall Act. As described in Security Pacific's letter, AIS would permit the bank's checking account customers to invest, through regular monthly deductions from their accounts, in stocks individually selected by the customers from a list of the twenty-five corporations on Standard & Poor's 425 Industrial Index having the highest aggregate market value of outstanding stock. For each stock selected, the customer would be required to authorize an automatic monthly deduction of between $20 and $500, to be invested each month until the customer terminated his participation in the plan.

The proposed method for purchasing and holding shares was described by Security Pacific as follows:

> Those electing to purchase stock will have their monthly deductions pooled with money of all others acquiring the same stock under the Service. Periodically, but not less frequently than once every month, the Bank will establish a cut-off date and promptly thereafter will acquire shares of each of the common stocks with all funds available, after deducting the service charge.[1] The funds will include any dividends that have been received by the Bank on full and fractional shares that it, or its nominee, is holding in safekeeping for users of the Service.

---

1. The letter stated that the service charge would be 5% of the amount invested, up to a maximum of $2.00 per month. In addition, each participant would be charged a pro rata share of the brokerage costs on the shares acquired.

The time between any cut-off date and the subsequent completion by the Bank of the acquisition of shares of common stock with funds obtained prior to the cut-off date will hereinafter be referred to as an "Acquisition Interval". Such Acquisition Interval shall not exceed thirty days. The price per share (including fractional shares) that will be charged each person who acquires shares of a stock during any particular Acquisition Interval will be the average price (including brokerage costs) paid by the Bank for all shares of that stock purchased by it under the Service during that Acquisition Interval. All the shares acquired under the Service will be held in the Bank's name or in the name of its nominee but the Bank will deliver, upon request, certificates representing whole shares to the owner.

Although the stock would be held in the name of the bank, each customer would have the right to vote the number of shares purchased on his behalf, and any customer wishing to withdraw from the Service would have a choice of receiving stock certificates representing the number of shares beneficially owned by him, or their cash value. The bank would have the power to "cross" sales made on behalf of customers withdrawing from the program with purchases for the account of continuing participants, thus saving the cost of brokerage.

On February 27, 1973, the Comptroller sent a brief letter to Security Pacific's counsel, responding to the February 12 inquiry. The letter stated, without any supporting analysis, the Comptroller's opinion that AIS, as set forth in Security Pacific's letter,

(1) Involves only purchases for the account of customers and not for the bank's own account; (2) That the bank in creating and managing the Service is not engaged in the business of issuing, underwriting, selling or distributing securities; and (3) That the operation of the Service by the bank is consistent with the provisions of section[s] 24 and 378 of Title 12, of the United States Code.

Learning of the existence of this letter, ICI—a national association of mutual funds, and their investment advisers and principal underwriters—wrote a letter and supporting memorandum, dated August 15, 1973, requesting the Comptroller to reconsider the position he had taken in his letter to Security Pacific. A similar request was filed by NYSE on September 7, 1973.

Citing interpretative rulings issued by the Comptroller's Office in the years immediately following enactment of the Glass-Steagall Act, both groups argued that the Act allows banks to purchase stocks only for pre-existing customers as a non-profit courtesy service; AIS—which they characterized as a profit-oriented activity utilizing extensive advertising to attract new customers to the bank—clearly would go beyond this domain. Appellants asserted, further, that AIS would present the same hazards which the Supreme Court identified in *Investment Company Institute v. Camp,* 401 U.S. 617, 636–38, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971), in support of its holding that operation of a collective investment fund involves a bank in activities which violate sections 16 and 21 of the Glass-Steagall Act. According to appellants, AIS—like operation of a collective investment fund—would "give rise to a promotional or salesman's stake in a particular investment," which "might distort its credit decisions or lead to unsound loans to the companies" whose stock has been purchased through AIS; "involve [the bank] in direct competition with aggressively promoted funds offered by other investment companies"; and "impair the bank's ability to give disinterested service as a fiduciary or managing agent." *Id.* at 637–38, 91 S.Ct. at 1102; *see id.* at 636–38, 91 S.Ct. 1091.

Upon receipt of ICI's request for reconsideration of the advisory opinion expressed in the February 27, 1973 letter to Security National, the Deputy Chief Counsel for the Office of the Comptroller wrote to respective counsel for Security Pacific, Chase Manhattan Bank (which ICI's letter had identified as a bank then providing a service virtually identical to AIS), and Invest-

ment Data Corporation (the firm which developed AIS), informing them of ICI's letter and inviting them to submit any comments which they desired to Comptroller to consider in connection with that letter. A memorandum supporting the February 27 ruling was submitted by counsel for Security Pacific, on behalf of Security Pacific and Investment Data Corporation; and opposing memoranda were submitted by ICI and NYSE.

On June 10, 1974, the Comptroller sent a letter to counsel for ICI, reaffirming his opinion that AIS is consistent with the Glass-Steagall Act. In contrast to the February 27, 1973 ruling, this letter contained a more extensive analysis of the underlying issues. The Comptroller noted, first, that AIS falls within the plain language of section 16, inasmuch as the service consists only of purchases and sales of stock upon the order, and for the account, of bank customers. After reviewing the legislative history of the Act, the Comptroller concluded, moreover, that Congress did not intend to prohibit profit or advertising with respect to such agency transactions, and that earlier interpretative rulings to the contrary resulted from the conservatism of the times and were simply erroneous.

As to the hazards alluded to by the Supreme Court in *ICI v. Camp, supra,* the Comptroller expressed only a tentative and provisional position:

> We are not unmindful of the potential for abuse, but until such time as abuse develops, we should not strain the meaning of 12 U.S.C. § 24 to stifle banks' competition in the free market for the patronage of American investors.

The Comptroller analyzed, among others, the contentions that AIS would impair the bank's ability to give disinterested investment advice, tempt the bank to make unsound loans to companies whose stock was purchased, and create conflicts of interest between the bank and its customers. In each case, however, he concluded that the alleged danger was not sufficient, without more experience of actual operation, to make AIS inconsistent with the Glass-Steagall Act.

Appellants filed an action in the District Court on September 24, 1974. Their complaint requested (1) a declaratory judgment that AIS is unlawful under sections 16 and 21 of the Glass-Steagall Act, and that the Comptroller's informal opinion of June 10, 1974 was consequently in excess of his statutory authority, (2) an injunction requiring the Comptroller to withdraw his June 10, 1974 ruling and to refrain from "approving" the operation of AIS by any commercial bank, and (3) an injunction forbidding the Comptroller from "continuing in effect" any "approvals" which may have been given to other banks.

The Comptroller moved to dismiss on the grounds that indispensable parties—the banks offering AIS—had not been joined; the informal opinions of February 27, 1973 and June 10, 1974 were not ripe for review; and NYSE lacked standing to sue.[2] The Comptroller moved, in the alternative, for summary judgment on the ground that his opinions were consistent with the Glass-Steagall Act; and appellants filed a cross-motion for summary judgment on the merits.

The District Court found that both appellants had standing, 404 F.Supp. at 1093, and ruled against the contention that indispensable parties had not been joined, *id.* at 1096. The court recognized that the ripeness of the informal rulings was a "more substantial issue," *id.* at 1094, but, relying heavily on *National Automatic Laundry and Cleaning Council v. Shultz,* 143 U.S.App.D.C. 274, 443 F.2d 689 (1971) (*NALCC*), and *Continental Air Lines, Inc. v. CAB,* 173 U.S.App. D.C. 1, 522 F.2d 107 (1975) (*en banc*), it held that judicial review was appropriate. With respect to the fitness of the issues for judicial decision, the court observed that an opinion letter similar in form to the ones in

---

**2.** Although the Comptroller asserted in the District Court that neither appellant had standing to sue, its motion to dismiss was directed only against NYSE for the reason that it could prove lack of injury to ICI's members only after discovery.

question here was found sufficiently final for review in NALCC, and expressed its judgment that the instant case "presents a 'purely legal' question only," 404 F.Supp. at 1095, *quoting Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

While conceding that appellants "are not facing the dilemma of obeying a questionable ruling or accepting the consequences of violating it," the position in which the plaintiffs in *Continental Air Lines* and *NALCC* found themselves, the District Court concluded that "the need for review is even stronger in the instant case than it was in *Continental Air Lines* or *NALCC* since the agency actions attacked in [those cases] would come under judicial scrutiny when a party chose to disobey the agency, but the action attacked by plaintiffs here will never come under review if this case is dismissed." 404 F.Supp. at 1095. Having thus disposed of the preliminary issues, the District Court turned to the "substantive" question of whether the Comptroller's advisory opinions reflected an accurate interpretation of the Glass-Steagall Act. After considering at some length the competing contentions of the parties, the court upheld the Comptroller's view. *Id.* at 1096–1101.

Appellants now urge us, on the basis of essentially the same arguments which they made to the Comptroller and then in the court below, to reverse the District Court and to hold that AIS contravenes the Act. For his part, the Comptroller again asserts that this issue should not be reached, citing alternative grounds of ripeness and standing.[3] If we do reach the substantive question, the Comptroller of course requests that we affirm the judgment of the District Court. Since we agree with the Comptroller's contention that the informal rulings attacked by appellants are not ripe for review, we express no judgment on the other issues argued before us.

II

The general principles governing the ripeness of administrative action for review are now well-established. As the *en banc* opinion of this court in *Continental Air Lines, Inc. v. CAB,* 173 U.S.App.D.C. 1, 18, 522 F.2d 107, 124 (1975), observed, before holding a formal policy statement by the CAB to be ripe for review:

> The law of ripeness, once a tangle of special rules and legalistic distinctions, is now very much a matter of practical common sense. *Abbott Laboratories, Inc. v. Gardner,* 387 U.S. 136, [87 S.Ct. 1507, 18 L.Ed.2d 681] (1967), dominates the field. It teaches that
>
> > the ripeness doctrine['s] . . . basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by challenging parties.

The same case prescribes a methodology for deciding whether a particular agency action is ripe for review:

> The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

*Id.* at 148–49, 87 S.Ct. [1507] 1515.

The label an agency attaches to its action is not determinative. The action may be reviewable even though it is merely an announcement of a rule or policy that the agency has not yet put into effect. Indeed, agency action may be reviewable even though it is *never* to have any formal, legal effect. What is required is that the interests of the court and agency in postponing review until the question arises in some more concrete and final form, be outweighed by the interest of those who seek relief from the

---

3. The Comptroller has not pressed the claim that the suit should be dismissed for failure to join indispensable parties.

challenged action's "immediate and practical impact" upon them. The former interests are encompassed within the first half of the *Abbott Laboratories* "twofold aspect," the "fitness of the issues for judicial decision," while the latter interests are expressed in the second part, the "hardship to the parties of withholding court consideration."

173 U.S.App.D.C. at 18–19, 522 F.2d at 124–25 (footnotes omitted) (emphasis in original). We proceed here, as we did in *Continental Air Lines,* by examining in turn the two aspects of ripeness outlined in *Abbott Laboratories*

With respect to the fitness of the issues for judicial decision, we note first that appellants are challenging informal opinion letters rather than formal rules or policy statements. Although the letters were signed by the agency head, and the second ruling followed consideration of adversary legal memoranda, the form of the Comptroller's action in fact reflected the tentative nature of his interpretative conclusion. Unlike the opinion letter in *National Automatic Laundry and Cleaning Council v. Shultz,* 143 U.S.App.D.C. 274, 443 F.2d 689 (1971), in which a general question of statutory construction had been conclusively resolved on the basis of the legislative history alone, the Comptroller in the instant case expressly reserved the possibility that his opinion, which extended only to the permissibility of the particular service proposed by Security Pacific, might change if and when he was presented with concrete evidence that AIS involves the hazards which the Glass-Steagall Act was intended to prevent. To be sure, the Comptroller did state what would appear to be relatively final positions regarding the consistency of AIS with the language of the Act, and his disagreement with the reading of the Act's legislative history which had been implicit in the narrower interpretative rulings issued by his predecessors, but these positions would in no way be incompatible with a future finding, based on evidence of AIS's actual operations, that it generates hazards sufficient to create a violation of the Act.

■ By the same token, we cannot agree with the District Court that the question decided by the Comptroller was "purely legal." No doubt determining the general interest of Congress from the language and history of the Act is a matter of law, but an assessment of the factual consequences of AIS to determine whether it falls within the scope of the congressional concerns requires resolution of factual issues, and an application of law to fact. While appellants contest, at the outset, the Comptroller's reading of the legislative history, a substantial part of their argument at all stages of this case has revolved around their disagreement with the Comptroller's estimate of the factual implications of AIS. To this extent, judicial review of appellant's claims would be aided by further factual development. *Compare Abbott Laboratories v. Gardner, supra,* 387 U.S. at 149, 87 S.Ct. 1507.

Given these shortcomings with regard to the fitness of the issues for judicial decision, it would take a substantial showing of hardship to the parties to convince us that the Comptroller's actions are ripe for review. No such showing has been made.

In *Abbott Laboratories, NALCC,* and *Continental Air Lines,* the alternatives to immediate review were quite severe: the parties either would have had to accept the adverse consequences of complying with the agency rulings in question, or risk serious penalties for noncompliance in order to obtain review at a later time. In each of the cases, this direct and immediate impact on the parties was an important factor in finding the rulings ripe for review. *See* 387 U.S. at 152–53, 87 S.Ct. 1507; 173 U.S.App. D.C. at 20–22, 522 F.2d at 126–28; 143 U.S.App.D.C. at 281–82, 443 F.2d at 696–97. Here, in contrast, appellants' conduct is not directly regulated by the agency action at issue and consequently they are not facing a "Hobson's choice" between burdensome compliance and risky noncompliance. Nonetheless, on the assumption that denial of review now would mean that appellants' claim would never come under judicial scru-

tiny, the District Court concluded that the need for review is even stronger in the instant case than it was in *Continental Air Lines* or *NALCC*. Believing, as we do, that the District Court's assumption was erroneous, we must disagree with its conclusion as to the necessity of review at this time.

Appellants concede, and the Comptroller agrees, that they could bring a private action for injunctive relief, advancing the same substantive claim they have made here directly against any national bank which offers AIS to its customers. Although we have been unable to find any case law squarely on point, and in any event are without power to make an authoritative ruling on the issue since it is not currently before us, we have no reason to believe that appellant would not have a private right of action for injunctive relief under the Glass-Steagall Act.[4] The express language of the statute neither authorizes nor precludes

such an action, but under the standards set forth in recent Supreme Court decisions we would suppose, first, that an implied right of action for injunctive relief would exist for appropriate parties and, second, that appellants would qualify as proper plaintiffs.[5]

■ Appellants contend that it would be unduly burdensome to bring a multitude of private actions against individual banks offering AIS. But it is not at all clear, especially in light of the very limited number of banks offering AIS or its equivalent, that a single successful private action would not be just as effective, in convincing the Comptroller to change his position on AIS, as a reversal in the instant case. And, in any event, we do not consider the inconvenience of having to initiate more than one suit to be a hardship sufficient to justify review in the current circumstances. *Cf. National Association of Insurance Agents v.*

4. In *Investment Co. Institute v. Camp,* 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971), ICI brought suit solely against the Comptroller, challenging, first, a regulation promulgated by the Comptroller purporting to authorize operation of collective investment funds by banks and, second, the Comptroller's approval of First National City Bank's individual application to operate such a fund. When ICI prevailed in the District Court, 274 F.Supp. 624 (D.D.C.1967), First National City Bank was granted leave by that court to intervene for the purposes of appeal, *see* J. A. 286–87 in *First National City Bank v. Investment Co. Institute,* 136 U.S.App.D.C. 241, 420 F.2d 83 (1969), *rev'd sub nom. ICI v. Camp, supra,* and was a participating party in both this court and in the Supreme Court. Under the circumstances, none of the decisions in the case had occasion to address the question of whether ICI could have brought an action directly against First National City Bank.

In *Russell v. Continental Illinois Nat'l Bank & Trust Co.,* 479 F.2d 131 (7th Cir.) (Stevens, J.), *cert. denied,* 414 U.S. 1040, 94 S.Ct. 541, 38 L.Ed.2d 331 (1973), the Seventh Circuit held only that *investors* in a mutual fund operated by a bank did not have a private right of action for *damages* against the bank under the Glass-Steagall Act. The case did not involve a claim for injunctive relief; moreover, in concluding that investors in bank-operated mutual funds were not within the class of persons intended to be protected by the statute, the court specifically distinguished the interests of such investors from the interests of ICI and its members,

which the Supreme Court found sufficient to create standing to bring an action against the Comptroller in *ICI v. Camp, supra. See* 479 F.2d at 133.

5. Both of these questions apparently would be governed by the general criteria set forth in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), and reaffirmed in *Piper v. Chris-Craft Indus., Inc.,* 430 U.S. 1, 37–41, 97 S.Ct. 926, 947–49, 51 L.Ed.2d 124 (1977);

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," . . .—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? 422 U.S. at 78, 95 S.Ct. at 2088 (citations omitted) (emphasis in original).

The Supreme Court's holding in *ICI v. Camp,* 401 U.S. at 620–21, 91 S.Ct. at 1094, "that Congress did legislate against the competition" which ICI challenged in that case, *see* note 4 *supra,* while not dispositive of the first issue, strongly suggests that appellants are part of the class for whose "*especial* benefit" the Glass-Steagall Act was passed.

*Board of Governors,* 160 U.S.App.D.C. 144, 147, 489 F.2d 1268, 1271 (1974).[6]

What appellants would have the courts do in this case is to determine the correctness of an informal statement by the Comptroller to the effect that he would not now take any action if Security Pacific goes forward with its proposed AIS, although he might take a different view of its compatibility with the Glass-Steagall Act at some point in the future after there has been some experience with its actual operation.[7] This is sought to be done at the instance of parties who, although very possibly possessed of standing to litigate the question in some circumstances, are not themselves subject to regulation by the Comptroller and who will be under no compulsion to do, or to refrain from doing, anything by reason of the advisory opinion in question. Neither is there now before the court any bank currently providing AIS or proposing to do so.

The record made in such a lawsuit would be barren indeed with respect to information highly relevant to, and informative of, the applicability of the statutory provisions in question. As indicated above, appellants have other avenues open to them for more meaningful and authoritative judicial resolution of the validity of AIS.

Since the agency action challenged here is not ripe for review, the decision of the District Court is vacated, and the case is remanded with instructions to dismiss the complaint.

*It is so ordered.*

WRIGHT, Circuit Judge, concurring:

I concur in the court's opinion. Because I believe that Judge McGowan is correct in suggesting that the appellants do have a private right of action under the Glass-Steagall Act against banks using Automatic Investment Services, appellants should first be required to put the issue in more concrete form by exploring that avenue of potential relief. However, if it is ultimately held that appellants lack a private right of action, prudential concerns inhering in the "hardship to the parties of withholding court consideration"[1] would, in my judgment, remove any doubt as to the ripeness of a subsequent suit by appellants against the Comptroller. There should be some means to obtain review of the Comptroller's interpretation of the statute.[2]

6. We note, in this regard, the command of the Administrative Procedure Act that "final agency action *for which there is no other adequate remedy in a court* [is] subject to judicial review." 5 U.S.C. § 704 (1970) (emphasis supplied).

There is language in *Medical Committee for Human Rights v. SEC,* 139 U.S.App.D.C. 226, 432 F.2d 659 (1970) (holding an SEC "no action" letter passed upon by the Commission to be reviewable), *cert. granted,* 401 U.S. 973, 91 S.Ct. 1191, 28 L.Ed.2d 322 *vacated as moot,* 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972), suggesting that the availability of a private right of action should carry relatively little weight in evaluating ripeness. *See id.* 139 U.S. App.D.C. at 234–35, 239, 432 F.2d at 667–68, 672. Whatever the force of that suggestion in the context of the proxy fight involved in that case, we are not persuaded that the bank competitors seeking review here would suffer hardship if they were forced to bring a private action instead. At any rate, the precedential value of this court's decision in *Medical Committee* was substantially diminished by the action of the Supreme Court in taking the case for review on the merits, which did not come

about only by reason of the intervention of mootness.

7. Under 12 U.S.C. § 1818(b) (1970), the Comptroller has authority to initiate cease-and-desist proceedings against any national bank which he believes to be engaging in a violation of the banking laws. It is conceivable that failure by him to exercise this authority would, in appropriate circumstances, be reviewable at the instance of interested parties under the standard of 5 U.S.C. § 706(2)(A) ("arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law"). *See Dunlop v. Bachowski,* 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975).

1. *Abbott Laboratories, Inc. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

2. *See Dunlop v. Bachowski,* 421 U.S. 560, 567, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); *Abbott Laboratories, Inc. v. Gardner, supra* note 1, 387 U.S. at 139–140, 87 S.Ct. 1507; *Stark v. Wickard,* 321 U.S. 288, 307–308, 64 S.Ct. 559, 88 L.Ed. 733 (1944).