292 F.3d 875
 NATURAL RESOURCES DEFENSE COUNCIL and Wilderness Society, Petitioners,
v.
FEDERAL AVIATION ADMINISTRATION and Jane F. Garvey, Administrator, Respondents.
 No. 01-1225.
 United States Court of Appeals, District of Columbia Circuit.
 Argued April 22, 2002.
 Decided June 14, 2002.
 
 On Petition for Review of an Order of the Federal Aviation Administration.
 Robert A. Bourque argued the cause for petitioners. With him on the briefs were Johanna H. Wald, Leslie Jones, Paul C. Gluckow and Sharon Buccino.
 Susan Pacholski, Attorney, U.S. Department of Justice, argued the cause for respondents. With her on the brief was Ronald Spritzer, Attorney.
 William P. Horn was on the brief for intervenor.
 Before: GINSBURG, Chief Judge, HENDERSON and ROGERS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge ROGERS.
 ROGERS, Circuit Judge:
 
 
 1
 The Natural Resources Defense Council, Inc. and The Wilderness Society (collectively "NRDC") petition for review of the Federal Aviation Administration's determination that the National Parks Air Tour Management Act of 2000, 49 U.S.C. § 40128, does not bar Vortex Aviation Inc.'s ("Vortex") proposed sightseeing tours out of the Jackson Hole Airport. Because we conclude that the issues presented in the petition are unripe for judicial review, we dismiss the petition for lack of jurisdiction.
 
 I.
 
 2
 In April 2000, Congress enacted the National Parks Air Tour Management Act ("the Act"), which provides for the regulation of commercial air tour operations over national parks and tribal lands within or abutting national parks. Pub. L. No. 106-181, 114 Stat. 185 (2000). The Act requires the Administrator of the Federal Aviation Administration ("FAA"), in conjunction with the Director of the National Park Service, to "establish an air tour management plan for any national park or tribal land" in order to "develop acceptable and effective measures to mitigate or prevent the significant adverse impacts, if any, of commercial air tour operations upon the natural and cultural resources, visitor experiences, and tribal lands." 49 U.S.C. § 40128(b)(1). Before conducting commercial air tour operations over national parks or tribal lands, the Act requires each commercial air tour operator to apply to the FAA for authority to conduct such operations. Id. § 40128(a)(2)(A).
 
 
 3
 The Act defines "commercial air tour operation" as:
 
 
 4
 [A]ny flight, conducted for compensation or hire in a powered aircraft where a purpose of the flight is sightseeing over a national park, within ½ mile outside the boundary of any national park, or over tribal lands, during which the aircraft flies —
 
 
 5
 (i) below a minimum altitude ... above ground level (except solely for purposes of takeoff or landing, or necessary for safe operation of an aircraft ...); or
 
 
 6
 (ii) less than 1 mile laterally from any geographic feature within the park (unless more than ½ mile outside the boundary).
 
 
 7
 Id. § 40128(f)(4)(A). In determining whether a particular proposed flight is a commercial air tour operation, the FAA "may consider" the following factors: "(i) whether there was a holding out to the public of willingness to conduct a sightseeing flight for compensation or hire; (ii) whether a narrative that referred to areas or points of interest on the surface below the route of the flight was provided by the person offering the flight; (iii) the area of operation; (iv) the frequency of flights conducted by the person offering the flight; (v) the route of flight; (vi) the inclusion of sightseeing flights as part of any travel arrangement package offered by the person offering the flight; (vii) whether the flight would have been canceled based on poor visibility of the surface below the route of the flight; and (viii) any other factors that the Administrator and the Director consider appropriate." Id. § 40128(f)(4)(B).
 
 II.
 
 8
 The Jackson Hole Airport, which is managed and operated by the Jackson Hole Airport Board pursuant to a Use Agreement with the United States, is located in the State of Wyoming, just inside the southern border of Grand Teton National Park. Vortex, which provides nonscheduled commercial aviation services pursuant to FAA certification under Parts 119, 133, 135, and 137 of the FAA's regulations, 14 C.F.R. pts. 119, 133, 135, 137, sought permission from the Board to operate charter flights, including scenic tours, out of the Airport. The Board, however, expressed concerns about the Act's applicability to sightseeing flights out of the Airport and the absence of an air tour management plan for the Park as required by the Act. Vortex, in turn, sought clarification from the FAA regarding the applicability of the Act to its proposed sightseeing tours out of the Airport. The NRDC challenges the FAA's letter responses to Vortex's inquiries.
 
 A.
 
 9
 In August 1999 and again in May 2000, Vortex applied to the Board for permission to operate charter services, including scenic air tours, out of the Airport. On May 17, 2000, the Board approved Vortex's proposed operations, but on June 12, 2000, concerned that Vortex's scenic air tour operations would violate the Act's restrictions on sightseeing tours over national parks, the Board rescinded its approval subject to Vortex's full compliance with the Act. Although Vortex continued discussions with the Board, claiming that Vortex's proposed flights were in compliance with the Act and that, in any event, the Board lacked the authority to prevent Vortex's operations, on July 17, 2000, the Board issued a moratorium on the approval of all commercial scenic air tour operations out of the Airport pending development of an air tour management plan or "other conclusive determination" that the proposed flights would not violate the Act.
 
 
 10
 On June 22, 2000, Vortex wrote to the FAA seeking clarification as to the applicability of the Act to Vortex's proposed air tour operations. In the letter, Vortex described its proposed flights, stating that its scenic air tour operations will not be conducted over the Park and emphasizing that it has "NEVER proposed flights over any portion of the [P]ark. [Except those portions that are necessary to fly over as a result to approach for a landing or for departure from takeoff.]" (brackets in original). Vortex asked the FAA to respond to four questions:
 
 
 11
 [1] Does the Act apply to the proposed scenic flights that Vortex intends on performing at the Jackson Hole Airport for flights conducted outside the Park?
 
 
 12
 [2] Does the language in [§ 40128(f)(4)(A)(i), the minimum altitude provision and its takeoff and landing exception,] ensure that those portions of flights that cross sections of the Park for normal approach to landing and departure from takeoff are excluded from being considered a scenic air tour over the Park when the final tour destination is, in fact, outside the Park?
 
 
 13
 [3] [Does the Use Agreement] constitute the current conditions of scenic air tour overflights for the Park until an Air Tour Management Plan is enacted and approved by the FAA in the future for Grand Teton Park?
 
 
 14
 [4] If the above is the affirmative, does the Park have the right to unilaterally change overflight rules in the absence of FAA approval under the terms and conditions of the Act? Do the current overflight rules of the Park "stay in place" until the whole process as defined in the Act take[s] place to enact a change from the existing rules contained in [the Use Agreement].
 
 
 15
 On August 13, 2000, Vortex wrote the FAA again. Informing the FAA that the Board had not lifted the moratorium, Vortex asked for clarification of the Board's authority to enforce the Act, and, stating that the Board was using the geographic feature provision of the Act, 49 U.S.C. § 40128(f)(4)(A)(ii), to preclude Vortex's flights, Vortex also sought the FAA's views on the meaning of "geographic feature" as used in the Act and the effect under the Act of flying within one mile of a geographic feature during takeoff and landing. On August 31, 2000 and October 17, 2000, the Board also wrote the FAA seeking its views on the meaning of "geographic feature" and "laterally" as used in the Act, and inquiring as to the Board's authority under the Act to control a flight's route.
 
 
 16
 The FAA responded to these questions in three letters. In the first letter, dated August 9, 2000, the FAA responded, through Donald P. Byrne, the Assistant Chief Counsel for the Regulations Division, to Vortex's first two questions, and concluded that the proposed flights would not violate the Act. In the second letter, dated September 7, 2000, the FAA, through Nancy D. LoBue, Assistant Chief Counsel for Airports and Environmental Law in the Office of the Chief Counsel, addressed Vortex's third and fourth questions concerning the Board's authority to impose restrictions on sightseeing flights out of the Airport, and declined to offer a definitive opinion. However, in the third letter, dated October 27, 2000, the FAA, through Mr. Byrne, offered an advisory opinion on the remaining questions presented by Vortex and the Board in their letters of August 2002.
 
 B.
 
 17
 The first letter. Regarding Vortex's first question, the FAA, through Mr. Byrne, stated that based on the information provided by Vortex, Vortex's proposed scenic flights would not violate the Act. He explained:
 
 
 18
 The term "commercial air tour operation," is defined, in part, as "any flight, conducted for compensation or hire in a powered aircraft where a purpose of the flight is sightseeing over a national park, within ½ mile outside the boundary of any national park, or over tribal lands...." [49 U.S.C. § 40128(f)(4)(A).] According to the information [Vortex] provided ..., Vortex Aviation's sightseeing operations are not conducted over Grand Teton National Park or within ½ mile of the Park's boundary[;] it is only entering and exiting the Park as necessary for takeoff and landing and following the takeoff and landing routes as prescribed by the Airport Board.
 
 
 19
 Thus, Mr. Byrne concluded, "it is clear that the National Park[s] Air Tour Management Act does not prohibit or limit Vortex Aviation's operations as long as Vortex Aviation conducts its sightseeing flights outside of Grand Teton National Park and more than ½ mile outside the Park boundary." Regarding Vortex's second question, Mr. Byrne stated that Vortex would not violate the Act by descending below the minimum altitude set forth in the Act as long as it was solely for the purpose of takeoff and landing.
 
 
 20
 The second letter. In a second letter, the FAA, through Ms. LoBue, began by noting "serious concerns" about the Board's moratorium on commercial sightseeing flights in view of the fact that the Board is primarily responsible for noise abatement and because the Airport's federal financial assistance is contingent upon the Board providing access to airport users "on fair and reasonable terms, without unjust discrimination." However, regarding Vortex's third question, she concluded that it was unnecessary for the FAA to issue an advisory opinion concerning the Board's authority to regulate sightseeing overflights of the Park under paragraph (h) of the Use Agreement, which governs commercial scenic and charter flights over noise sensitive areas of the Park. Vortex, she stated, "is not proposing to initiate flights over [the Park] (other than those necessary to land and takeoff)." She explained further that "[i]f Vortex proposes to initiate such flights before the [Act] is implemented by regulation, then FAA would discuss the genesis and proper interpretation of paragraph (h) with the parties to the Use Agreement before issuing any definitive opinion." Similarly, regarding Vortex's fourth question, Ms. LoBue declined to reach the legality of paragraph (h) of the Use Agreement because "Vortex is not currently conducting overflights of the Park except for landings and takeoffs."
 
 
 21
 The third letter. On October 27, 2000, the FAA, through Mr. Byrne, responded to the remaining questions that Vortex and the Board posed. Mr. Byrne stated that the "Board has no authority under the Act to prohibit scenic operations from taking off or landing at Jackson Hole Airport" or to otherwise enforce the Act by establishing flight routes. He offered an interpretation of the geographic feature provision of the Act, providing hypothetical examples of its applicability.
 
 III.
 
 22
 On May 23, 2001, the NRDC petitioned for review of the FAA's opinion, as set forth in the three letters of August 9, September 7, and October 27, 2000, that the Act did not bar Vortex's proposed flights. The NRDC contends that, contrary to the Act's express and unambiguous terms, the FAA misinterpreted the Act (1) by erroneously concluding that a flight is not a "commercial air tour operation" unless its only purpose is sightseeing despite the unambiguous statutory language that requires only that "a purpose of the flight [be] sightseeing," 49 U.S.C. § 40128(f)(4)(A) (emphasis added), and (2) by improperly interpreting the takeoff and landing exception of the minimum altitude provision, id. § 40128(f)(4)(A)(i), as an exception to the entire commercial air tour operation definition, including its separate geographic feature subsection, id. § 40128(f)(4)(A)(ii). The NRDC also contends that in concluding that Vortex's proposed flights were not covered by the Act, the FAA failed to analyze Vortex's "self-serving assertion that the purpose of its flights while over the Park was only to takeoff and land from the Airport, despite clear evidence in the record ... that Vortex's flights also had an undeniable sightseeing purpose," as indicated by Vortex's proposal to take a route that would prolong the flight time over the Park and thus provide "a spectacular view of the Park's signature geographic feature," the Tetons. Petitioners' Br. at 18.
 
 
 23
 The FAA disputes the NRDC's contentions on the merits, pointing to "the unique circumstances of this case, where a major airport is located within a national park," Respondents' Br. at 13, but contends as a threshold matter that the court lacks jurisdiction because (1) the petition is untimely under 49 U.S.C. § 46110(a); (2) the three letters do not constitute final agency action under 49 U.S.C. § 46110; (3) the issues raised in the petition are unripe; and (4) the petitioners lack standing. Because we conclude that the issues presented in the petition are not ripe for review, we do not address the merits of NRDC's petition or the FAA's additional jurisdictional claims.
 
 
 24
 The basic rationale underlying the ripeness doctrine is preventing courts from entangling themselves in premature adjudication involving abstract disagreements over administrative policies. Abbott Labs. v. Gardner, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). It is well established that the court's ripeness inquiry is twofold, requiring us "to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Id. at 149, 87 S.Ct. at 1515-16; see also Wyo. Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 48 (D.C.Cir.1999).
 
 
 25
 Under the fitness for review prong, the court considers not only whether the claims present purely legal questions that are presumptively suitable for judicial review, but also whether the courts and agency would benefit from postponing review until the questions at issue have taken on a more definite form. Cronin v. FAA, 73 F.3d 1126, 1131 (D.C.Cir.1996). Thus, "the `court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting' militate in favor of postponing review if, for example, the court finds `that resolution of the dispute is likely to prove unnecessary,' or `that the court's deliberations might benefit from letting the question arise in some more concrete ... form.'" Id. (quoting Eagle-Picher Indus., Inc. v. EPA, 759 F.2d 905, 915 (D.C.Cir.1985), and State Farm Mut. Auto. Ins. Co. v. Dole, 802 F.2d 474, 479 (D.C.Cir.1986)) (alteration in original) (citations omitted). These factors weigh against immediate review.
 
 
 26
 First, the interpretation of the Act that the NRDC challenges was set forth in three letters that on their face demonstrate the tentativeness of the legal determination regarding Vortex's operations. This is evident from the fact that the FAA, in determining that the Act did not bar the proposed flights, relied solely on Vortex's descriptions of the flights that it was proposing to fly out of the Airport. In the first letter to Vortex, Mr. Byrne stated:
 
 
 27
 According to the information you provided..., Vortex Aviation's sightseeing operations are not conducted over Grand Teton National Park or within ½ mile of the Park's boundary, it is only entering and exiting the Park as necessary for takeoff and landing....
 
 
 28
 ....
 
 
 29
 Given the facts as stated above, it is clear that the National Park[s] Air Tour Management Act does not prohibit or limit Vortex Aviation's operations as long as Vortex Aviation conducts its sightseeing flights outside of Grand Teton National Park and more than ½ mile outside the Park boundary. (emphasis added)
 
 
 30
 In the second letter, Ms. LoBue reaffirmed the tentative nature of the first letter, explaining that although it was unnecessary for the FAA "to issue an advisory opinion concerning the authority of the Board to regulate commercial sightseeing overflights" because Vortex had not proposed sightseeing flights over the Park, the FAA would reconsider this decision if, in fact, Vortex "proposes to initiate such flights." Finally, in the third letter, Mr. Byrne again emphasized the hypothetical and advisory nature of the opinion stated in the letters, noting that "[t]he FAA already has issued an interpretation stating that Vortex's proposed sightseeing operations are not covered by the Act if they are conducted outside the boundaries of Grand Teton National Park, regardless of the fact that Vortex lands and departs from Jackson Hole Airport." (emphasis added).
 
 
 31
 The three letters thus make clear that the FAA's determination of the applicability of the Act flowed solely from Vortex's description of its proposed flights. In other words, the FAA's interpretation of the Act was not based upon a factual determination, consistent with the factors that the FAA may consider under the Act in determining whether a flight is a commercial air tour operation, see 49 U.S.C. § 40128(f)(4)(B), that Vortex's actual operations would be immune from regulation under the Act. The FAA did not purport to make any findings in the letters regarding whether Vortex's actual flights had as a purpose sightseeing over the Park. Had the FAA done so, presumably it would have addressed Vortex's "true" purpose and intent in light of Vortex's choice of flight path and flight times and Vortex's description of its tours on its website. As it was, however, the FAA made neither findings regarding, nor mention of, Vortex's proposed departure routes, Vortex's flight times, or Vortex's description of its tours on its website, all of which are relevant factors in making a determination as to whether, in fact, a flight is a commercial air tour operation, see id. To the extent the FAA rendered an interpretation of the Act based on Vortex's factual assertions, in essence, the FAA's views were based on a hypothetical factual scenario and hence are not appropriate for review. Cf. Aerosource, Inc. v. Slater, 142 F.3d 572, 579-80 (3d Cir.1998). Indeed, the interpretation of the Act in the three letters, while seemingly a final position as to the applicability of the Act to the hypothetical flights described by Vortex, would be consistent with a future determination by the FAA that Vortex's flights violate the Act if, for example, the NRDC's assertions are borne out by the evidence.
 
 
 32
 Second, the issues raised in the NRDC's petition are not strictly legal in nature. Determining the applicability of the Act to Vortex's actual flights requires the application of law to facts based on evidence that was not before the FAA and is not before the court. Further, the challenges to the FAA's interpretation of the Act, which present legal issues, are intertwined with the FAA's assessment of "the facts." For example, in contending that the FAA wrongly read the Act to be triggered only when "the only purpose" of a flight is sightseeing over a Park rather than when "a purpose" of a flight is sightseeing (as the NRDC contends the Act requires), the NRDC also maintains that the FAA ignored the factual possibility that Vortex's flights could have a dual purpose that includes sightseeing over the Park. To resolve the validity of the FAA's statutory construction, the court would have to examine the record evidence to determine whether the FAA's factual findings were supported and whether the FAA's assessment of the purpose or purposes of Vortex's flights was appropriate. Again, however, the FAA did not purport to make findings as to whether Vortex's actual flights had as a purpose sightseeing over the Park but took as true Vortex's assertion that it was not conducting sightseeing tours over the Park. Even the seemingly legal issues presented by the NRDC turn then on evidentiary facts that are not developed in the record.
 
 
 33
 As the FAA observes, the NRDC, to advance its challenges to the FAA's statutory interpretation, "indulge[s] in speculation regarding the probabl[e] routes of Vortex's flights, their likely duration and the quality of the scenery that might be visible from the windows of Vortex's helicopters," and relies on documents that were not before the FAA, including a map of Vortex's proposed flight path and information placed on Vortex's website a year after the FAA's letters were issued. Respondents' Br. at 25. Further, the FAA states in its brief that because Vortex began operating out of the Airport in the summer of 2001, there is now actual evidence of Vortex's operations out of the Airport. Under the circumstances, this is a classic case where "further factual development would `significantly advance our ability to deal with the legal issues presented' and would `aid us in their resolution.'" Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 737, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998) (quoting Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 82, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978)).
 
 
 34
 In light of the tentative nature of the FAA's interpretation of the applicability of the Act to Vortex's flights and the lack of a factual grounding for the NRDC's challenges, the views expressed in the FAA's three letters are akin to the informal opinion letters at issue in New York Stock Exchange, Inc. v. Bloom, 562 F.2d 736 (D.C.Cir.1977), that the court concluded were unripe for review. Id. at 741-43. In Bloom, the court explained that the issues were unfit for review, in part, because the informal form of the Comptroller's action "reflected the tentative nature of his interpretative conclusion," in which the Comptroller "expressly reserved the possibility that his opinion, which extended only to the permissibility of the particular service proposed ..., might change if and when he was presented with concrete evidence" as to the applicability of the Act. Id. at 741. Moreover, although the issues in Bloom were legal in the sense that they involved statutory construction, the court explained that they were not fit for review because a substantial part of the challenges to the Comptroller's opinion was the parties' disagreement with the Comptroller's factual assessment. Id. Both of these elements are present here. Just as in Bloom, the issues are not fit for judicial review because, in the end, they lack sufficient concreteness and they would require the court to conduct a purely hypothetical inquiry. Cf. Nat'l Automatic Laundry & Cleaning Council v. Shultz, 443 F.2d 689, 699 (D.C.Cir.1971).
 
 
 35
 Turning to the hardship prong, because the issues would benefit from postponing review, the NRDC must demonstrate immediate, direct, and significant hardship to warrant immediate review, Cronin, 73 F.3d at 1133, and it has failed to do so. Unlike agency regulations that can force compliance through a fear of immediate sanction, see Abbott Labs., 387 U.S. at 152-53, 87 S.Ct. at 1517-18, the NRDC is neither regulated by the FAA nor forced to change its conduct in order to avoid future adverse consequences as a result of the letters. Further, any harm incurred by the NRDC as a result of Vortex's actual conducting of sightseeing flights is not a direct consequence of the three letters at issue as they do not authorize Vortex's current flights out of the Airport. See Ohio Forestry Ass'n, 523 U.S. at 733, 118 S.Ct. at 1670. Finally, the NRDC has an alternate remedy. In the event Vortex's actual flights violate the Act in the opinion of the NRDC, the NRDC can file a complaint with the FAA, pursuant to 49 U.S.C. § 46101(a), whereupon the FAA would be required to "investigate the complaint if a reasonable ground appears to the ... Administrator for the investigation." 49 U.S.C. § 46101(a). These factors all weigh against the need for immediate review. Cf. Bloom, 562 F.2d at 743.
 
 
 36
 Accordingly, because the issues presented by the petition are not presently fit for review and the NRDC would suffer no significant hardship from delaying review, we dismiss the petition as unripe and do not address either the remaining jurisdictional issues, Fourth Branch Assocs. (Mechanicville) v. FERC, 253 F.3d 741, 745 (D.C.Cir.2001), or the merits, see Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95, 101-02, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).